NEW YORK LIFE INSURANCE
CO., Plaintiff,

v.

Paul David WITTMAN and Jean
Wittman, Defendants.

No. 89 CV 2446.

United States District Court,
N.D. Ohio, E.D.

Jan. 6, 1993.

Order Granting Motion to Alter or Amend
Feb. 2, 1993.

Eliott R. Good, Chorpenning, Good & Mancuso, Columbus, OH, for New York Life Ins. Co.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, OH, for Paul David Wittman and Jean Wittman.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAM H. BELL, District Judge.

## I. INTRODUCTION

On the 19th of December, 1989, plaintiff filed this action for rescission of a certificate of insurance issued to the defendant, Paul David Wittman. On January 29, 1990, defendants filed their answer which included a two-count counterclaim, averring that: (1) plaintiff's refusal to pay the defendant the monthly benefits due to him under the policy constitutes gross negligence; and (2) as a proximate result of plaintiff's intentional, reckless, extreme and outrageous conduct, plaintiff has subjected defendant to severe emotional distress. Jurisdiction over this case is predicated upon the diverse citizenship of the parties, 28 U.S.C. § 1332.

On May 10, 1992, plaintiff filed a motion for partial summary judgment, directed toward its rescission claim. On the 27th of August, 1991, this court addressed that motion and defendants' counterclaim. In so doing, the court made the following conclusions. First, it was determined that the substantive law of the State of Ohio applies to this case. *New York Life Insurance Co. v. Wittman,* No. 89 CV 2446, slip op. at 9, 1991 WL 477707 (N.D.Ohio August 27, 1991) (order granting partial summary judgment). Consequently, this cause is governed by Ohio Revised Code § 3923.14, which articulates a pentadactyl test which the insurer must satisfy in order to rescind a health and accident insurance policy. That section provides, in pertinent part, the following:

> The falsity of any statement in the application for any policy of sickness and accident insurance shall not bar the right to recovery thereunder, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such false statement is [1] willfully false, [2] that it was fraudulently made, [3] that it materially affects either the acceptance of the risk or the hazard assumed by the insurer [4] that it induced the insurer to issue the policy, and [5] that but for such false statement the policy would not have been issued.

Ohio Rev.Code § 3923.14. Applying this law to the instant case led to the conclusion that the defendant "did knowingly file a false insurance application" and hence resulted in the grant of partial summary judgment on the first two elements of the statutory test. (slip op. at 12) Nevertheless, there existed questions of fact sufficient to preclude summary judgment on the three remaining elements of the five part test. (*Id.* at 15) Thus, the three remaining elements were permitted to proceed to trial. In conclusion, it was ordered, with the agreement of the parties, that the trial would be limited to the rescission claim advanced by the plaintiff. (*Id.* at 15–16)

Trial before the bench was held on 20th, 21st, 22nd and 26th of May, 1992. Extensive post-trial briefing ensued. The following findings of fact and conclusions of law, the product of that trial, are herein provided pursuant to Fed.R.Civ.P. 52.

## II. OPINION

### A. Findings of Fact

1) Prior to his policy application, defendant made several visits to his physician complaining of symptoms suggestive of heart problems.

2) Prior to his policy application, defendant had several diagnostic tests performed on him because of the coronary symptoms he was suffering. One of these tests suggested the presence of sick sinus

syndrome; subsequent tests, including a multi-stage stress test and electrocardiograms, suggested normality. (T. at 247)

3) Sick Sinus Syndrome, or SSS, refers to the effects of an improperly functioning sinus node, the basic pacemaker of the heart. (T. at 607) One suffering from such a condition experiences irregular heart rhythms variably very slow or very fast rhythms. Abnormalities on electrocardiograms must exist to make a diagnosis of sick sinus syndrome. (T. at 608) This condition is, as one doctor put it, "bad heart disease." (T. at 184).

4) The defendant applied for a policy from his employer, New York Life, on April 29, 1988 and answered "no" to application questions which asked whether he had consulted a physician for coronary related symptoms, or had had diagnostic tests.

5) Mr. Wittman's application was reviewed by Mary Gillette, who was, at that time, a senior underwriting associate for plaintiff, New York Life. (T. at 88)

6) As one would expect, the underwriting process, and the process engaged in by Ms. Gillette begins with an examination of the insurance application itself. (T. at 94–95)

7) When an application first arrives from regional general offices, it is examined by an individual designated an "express underwriter". The express underwriter's task is to identify investigatory documents needed to confirm information contained on an application. (T. at 99)

Should the application indicate pertinent medical conditions exist, express underwriter will order what is called an "attending physician's statement" ("APS") from the general office.[1] An APS includes the applicant's medical records. (T. at 222) The file is then sent to station clerks, who hold the file until the investigatory reports arrive, and then the application is sent on the underwriter. (T. at 99–100) The evidence

in this case proves that had defendant given truthful answers on his application, New York Life would have secured an attending physician's statement.

(9) At New York Life, the underwriter, even though he or she may ask for assistance from the Medical Department, has the final say in whether a policy is issued. (T. at 96) He or she utilizes the company's underwriting manual. If the underwriter is unsure what medical records indicate, he or she will confer with her "senior", who could hopefully answer questions. If the "senior" is unable to address the concerns of the underwriter, the question will be referred to the Company's medical department. (T. at 326–27) The court finds as fact here that had the defendant given truthful answers, the medical records received by the insurer would have prompted it to make further inquiry from the doctors attending to Mr. Wittman, from the company's Medical Department or from both.

10) Because there are more things that can cause a disability be those things medical or non-medical in nature, than can cause premature death, the underwriting of a disability insurance policy is more conservative than the underwriting of a life insurance policy. (T. at 498)

11) Defendant's application did reveal a laminectomy performed on defendant prior to application. Because the underwriting manual was quite specific on these matters, the policy was issued, but with a rider excluding disabilities due to the laminectomy. (T. at 107–08)

12) The remaining medical portion of the application was clean, and, at the recommendation of Ms. Gillette, plaintiff thus issued the policy relying upon the validity of the representations contained therein. (T. at 219)

13) A few months later, the defendant suffered a cerebral vascular accident ("CVA", commonly known as a stroke) and made a claim for benefits on the basis of

---

**1.** The underwriter who will issue or decline the policy may also ask for investigatory reports. (T. at 100) In addition, to these reports, the underwriter will utilize the underwriting manual and a medical dictionary to exercise what is

called, in the industry, underwriting judgment. Exercise of that judgment may call for determination of the risks entailed by conditions not diagnosed or not found in the underwriting manual. (T. at 408–09).

this malady. Although there is a slight possibility to the contrary, it seems clear and the court finds as fact that the stroke was unrelated to the conditions omitted from defendant's benefit application. (*See, e.g.* Tsai Testimony, T. at 75: "Q: Now, it is your opinion, isn't it Dr. Tsai, taking into consideration the tests that you performed and reviewed, taking into consideration your review of Dr. Kennedy's office records, and your knowledge that the CVA was diagnosed in Dave Wittman in the Fall of 1988, it is your opinion based upon reasonable medical certainty that there is no causal connection or causal relationship between any condition of this man's heart and that CVA in September of 1988; isn't that true?" A: That is very true.") (*Cf.* T. at 157 Dr. Kennedy "cannot disassociate that connection 100 percent."); (*See generally,* Strachan Testimony, T. at 188–212).

14) After defendant suffered his stroke, he made a claim for benefits. The New York Life claims department received defendant's medical records, and found they revealed symptoms and diagnostic exams not contained in the application. The claims department forwarded these documents to Ms. Gillette, to determine what her underwriting decision would have been had she had the information omitted on the application. (T. at 219) The records referred to included those of the defendant's personal physician, Dr. Kennedy, and those from Robinson Memorial Hospital. (T. at 220)

15) The records disclosed a series of pre-application complaints of symptoms suggestive of heart problems (i.e. chest pains and palpitations etc ...) and a series of tests to determine the cause of these symptoms. The first test resulted in a notation, by an internist,[2] that it was *suggestive* of sick sinus syndrome[3]; the remaining tests suggested normality. Although there is no record notation ruling out the possibility of sick sinus syndrome, the normal tests effectively rule out a diagnosis of sick sinus syndrome and the suspicion of underlying heart problems. (T. at 24, 616–618, 631) (*See, e.g.,* Tsai Testimony at 55 "the tests do not support sick sinus syndrome in any way, shape or form."; Kennedy Testimony at 129, 183 "[h]e does not suffer from sick sinus syndrome.... [b]ecause all the cardiac testing we did really failed to substantiate that diagnosis...."; "I don't believe there's any underlying heart disease here.") Defendant's records from Robinson Memorial Hospital, signed by Dr. Kennedy, plaintiff's attending physician, state that defendant had a history of heart disease, suffered chest pains and had been diagnosed as suffering from sick sinus syndrome. Interestingly, these records *postdate* cardiac tests taken by plaintiff, all of which tests indicate heart normality. It is apparent, even as New York Life's underwriter indicated, that the references to sick sinus syndrome stem from the first test which *suggested* its presence. (Bottega Testimony, T. at 451) Of significance is the further fact that the records reflect *no* treatment ordered for the insured as a result of his complaints or tests. . He was never hospitalized, given medication, placed on a restricted diet or *referred to a cardiologist.*

In response to viewing at least one of the normal test results, Mr. Bottega told the claims adjuster handling the case that "there is a clinical diagnosis of Sick Sinus Syndrome made in this report. Additionally, conclusion also shows mild left ventricular hypertrophy. Our und. [underwriting] decision of 6/7/89 is still RNA [risk not acceptable]."—confirmed *Med.*)[4]

16) On the basis of her review, Ms. Gillette indicated that:

---

**2.** The physician whom the hospital records indicated as having diagnosed sick sinus syndrome, Dr. Tsai, indicated at trial that he "would not diagnose that as sick sinus syndrome." (T. at 65–66) The doctor also considered the remaining tests performed by him compelled him to conclude that "there was no indication of any heart condition of any kind, no heart problem and no heart trouble. (*Id.*)

**3.** Not a *diagnosis* of sick sinus syndrome,. T. at 642.

**4.** Mr. Bottega stated that his conclusion was confirmed by the Medical Department. Mr. Bottega also testified that it is the duty of the medical department to review the whole file. However, this court has no indication of what was actually reviewed by the medical department at New York Life, what conclusion was actually reached by that medical department,

We would not have issued this policy had we known of medical history which includes tachycardia—PAC [premature atrial contractions]—chestpains in 1983 and the diagnosis of sick sinus syndrome prior to 1985. We would have declined this application for coverage.

Please note copy of Underwriting Rules Attached.[5]

(Plaintiff's Exhibit 19). This statement was signed by both Ms. Gillette and her superior, Joseph Bottega, who concurred in her judgment that the picture of plaintiff's health given by the records, namely, the recurring cardiac symptoms suggestive of an unknown and undiagnosed heart disease (T. at 488) and the putative diagnosis of sick sinus syndrome would have led to immediate denial of coverage. At trial, the plaintiff identified physical complaints (e.g. left-sided numbness lasting one to two seconds) in addition to those listed in the memo above. Nevertheless, two thing seems clear. First, plaintiff's underwriters were primarily concerned with the possibility of an unknown heart disease and the possibility of sick sinus syndrome. The additional "symptoms" identified by them do little more than emphasize the first of their concerns. Second, there is a question in this court's mind whether the plaintiff's underwriters would have considered these conditions in their initial underwriting decision. The above-quoted memo was written before the start of this litigation and there is testimony which suggests that these additional physical manifestations are more the product of trying to bolster the rescission claim rather than being considered material to the initial underwriting decision:

Q: It was not until five months after you wrote your initial opinion [that the policy would not have issued] and three months after you reaffirmed your opinion of June '89 that you said anything about the June 25 consultation [discussing left-sided numbness]; isn't that correct?

A: That's correct.

Q: I'm showing you Defendant's Exhibit U–6 which is a typed memo to you or to Cinque from Mr. Darken [a corporate vice president in the disability claims division], correct?

A: That's correct.

Q: Mr. Darken says, hey fellows, what about this June 25, 1985 visit; am I right?

A: That's correct.

Q: And that's when you than say, oh yeah, that's another thing of significance; am I right?

A: That's correct.

Q: And what you were doing at Mr. Darken's suggestion was picking out another point that justified your recommendation for rescission; isn't that true?

A: That was a point that we didn't put on the opinion; that's correct.

Q: And you did it in order to bolster your recommendation for rescission action, didn't you, Mr. Bottega?

A: We did it to bring out the recommendation of what our opinion was in relation to that particular diagnosis.

Bottega Testimony, T at 482.

15) On the basis of the underwriter's objections, Frank Cinque, the initial claim

---

and what procedures the medical department would have followed at the time of application for the simple reason that neither party called a member of that department to testify. Instead, we have Mr. Bottega's query to the medical department, which presupposes a diagnosis of sick sinus syndrome and asked the medical personnel to "please note tagged page of APS" and that he had "tagged another page from Dr. Kennedy's records." (*See infra* factual finding # 21) The medical department's reply is peculiar in several respects; it is clearly couched in underwriting terms; and apparently addresses only the concerns addressed by Mr. Bottega, i.e. the sick sinus syndrome (which may well have been assumed by the medical department) and the

palpitations (arrhythmia). (*See infra* factual finding # 21). Simply put, the medical department's "review" of defendant's files is of questionable probative value.

**5.** The New York Life underwriting manual states that if there is any "indication of ... sick sinus syndrome, decline." "Any indication" as used in the New York Life Manual, means a working or clinical diagnosis. There was clearly no clinical diagnosis of sick sinus syndrome in this case. The court, based upon the testimony of Dr. Kennedy, also believes there was no working diagnosis either. *See* Kennedy Testimony, T. at 167–170.

reviewer recommended rescission and passed along defendant's file to John Darken.

17) On May 19, 1989, John Darken, Corporate Vice President in charge of the Disability Claims Division of New York Life, had a telephone conversation with Mr. Wittman and told him that he was prepared to rescind the policy on the basis of his prevarication and suggested that if Dr. Kennedy, defendant's personal physician had anything else to submit, that he should do so and New York Life would be glad to do that. (T. at 358)

18) Mr. Wittman then wrote Mr. Darken and attached the following letter from Dr. Kennedy:

RE: Dave Wittman

To Whom It May Concern:

Dave Wittman has asked me to write to you concerning his previous history of tachyarrhythmia which was noted in late 1983 and early 1984. Dave's presenting complaints were that of palpatations and his history included smoking. He was worked up and felt that possibly (sic) had a sick sinus syndrome though there was some question about that.

His symptoms resolved shortly after January of 1984 when he was instructed by the cardiologist to discontinue coffee completely.

Dave was possibly not under the understanding that he had a heart problem and looked at this as just a problem with coffee or caffeine. He has had no cardiac symptoms since that time.

Sincerely,

s./ Philip A. Kennedy, M.D.

(Plaintiff's Exhibit 21A) At trial, Dr. Kennedy's admission (T. at 179) that this "was a poorly written letter"; was something of an understatement.

21) Mr. Bottega, Ms. Gillette's superior in the underwriting department, after the initial recommendation for rescission had been made and after that decision had been communicated to defendant, did refer the case to New York Life's Medical Department:

Please note tagged page of APS from which we rendered a recision (sic) on

4/15/89 for a diag. of sick sinus syndrome. We now have a copy of a report date 5/19/89 from Dr. Kennedy. Additionally, I have tagged another page from Dr. Kennedy's records dated 2/17/87 covering period of palpitations every 4–6 mos. May we have your opinion in view of this (indecipherable) applicant is one of our sales managers. Please call when ready.

(Plaintiff's Exhibit 36) The *next day,* the medical department responded:

Our Part II clearly ask (sic) P.I. [proposed insured] if he had (indecipherable) [likely "history"] of heart disease includ. irregular pulse. He did not answer this question.

If we would have known of a (indecipherable) [likely "history"] of arrythmia, we would have called for an APS & current EKG.

If APS was available with indication of sick sinus syndrome, the app. would have been declined.

(*Id.*) Later, the medical department was asked to review a report of a normal cardiac test taken by defendant. Their analysis is unknown.

22) Eventually, the rescission letter was issued and rejected by the defendant, resulting in this lawsuit.

The above stated facts, it is believed, are shown by the evidence. Additional facts found to have been proven by the evidence presented will be discussed as necessary in the court's legal and factual analysis which follows.

As a guide to that which will now become the focus of discussion, the following thoughts are offered. First, the general and specific issues of materiality will be considered. Because this court will voice an opinion concerning the state of the law in Ohio as that law relates to materiality in the context of insurance law, the discussion will be of necessity somewhat attenuated.

Second, the application of each section of O.R.C. § 3923.14 is to be tested against the facts as those facts are found to be. Because the circumstances which have lead to this litigation are so bizarre a somewhat

lengthy analysis is mandated. Once again, as practitioners of our profession know so well, that which appears to be so is not always so; that which is understood to be fact is quite often fiction, and that a misperception, once memorialized by repetitious data gathering assumes a life of its own.

Here at some point of pregnancy to this litigation, Mr. Wittman's physician suggested the existence of a condition; because that suggestion was made, it was reflected in certain records as a fact. The evidence also indicates that subsequent tests indicated no support of the suggestion; indeed heart normalcy seemed the case. But Wittman, as has been seen, falsely answered questions which bore on the question relevant to his state of health. The court's view of the effect of these circumstances now follow beginning with conclusions of law inasmuch as an appropriate discussion of the Ohio law is of primary importance to the conclusion reached in the opinion.

### B. Conclusions of Law

#### i. *Materiality*

■ As noted above, the sole question this court must determine from trial is whether the plaintiff, New York Life, has proved, by clear and convincing evidence, that Mr. Wittman's fraudulent misrepresentation:

1) materially affect[ed] either the acceptance of the risk or the hazard assumed by the insurer;

2) induced the insurer to issue the policy, and

3) that but for such false statement the policy would not have been issued.

Ohio Rev.Code § 3923.14.[6] The clear and convincing standard, in this Ohio rescission action, requires proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond reasonable doubt in criminal cases." *Thompson v. New York Life Ins. Co.*, 1989 WL 148033, * 4, 1989 Ohio App.LEXIS 4554, * 9 (2d App. Dist.1989), *mot'n overruled,* 50 Ohio St.3d 708, 553 N.E.2d 689 (1990).

At this point, it is worth noting that there is a surprising scarcity of cases construing the language of Section 3923.14.[7] The unusual facts surrounding the instant matter have prompted both plaintiff and defendant to fixate upon the materiality requirement of Section 3923.14. This requirement has been addressed in but one unpublished Ohio appellate court opinion. *Thompson v. New York Life Insurance Co.*, 1989 WL 148033 at * 5, 1989 Ohio App.LEXIS at * 14. There, the court stated:

Section 3929.14 (sic) requires the insurer to show that it would not have issued a policy but for the alleged misrepresentation. Good health does not require absolute freedom from all bodily infirmities. *Pope v. Reserve Life Insurance Co.*, (1963), 120 Ohio App. 394, 202 N.E.2d 708. In order for a prior medical claim to be material, there must be a relationship between the prior infirmity and the infirmity which forms the basis of the claim. *Id.* It is not enough to assert in

**6.** This statutory standard, requiring both fraudulence and materiality, imposes a greater burden upon the insurer than that imposed upon a party seeking avoidance of a contract at common law. *See* Restatement (Second) of Contract § 164(1) ("Misrepresentation makes a contract voidable ... if a party's manifestation of assent is induced by *either fraudulent or material* misrepresentation....") *See also* Introductory note preceding § 159 of the Restatement ("Notably, under tort law a misrepresentation does not give rise to liability for fraudulent misrepresentation unless it is both fraudulent and material, while under contract law a mis-

representation may make a contract voidable if it is either fraudulent or material.")

**7.** In fact, there are only 19 reported decisions (published and unpublished) which *cite* this statute. A number of these do not discuss Section 3923.14 in any meaningful manner. The remainder, unfortunately, are inordinately attentive to the fraudulent nature of the insured's statements and are therefore of little assistance at this point in our analysis, where we are forced to concentrate on the effect of the insured's statements.

an affidavit that the alleged omission is a material omission. Rather, under 3923.-14, the insurer must point to the evidence and establish some relationship between the past infirmity allegedly omitted from the application and the infirmity forming the basis of the claim.

*Id.*[8] This language was repeated by the Sixth Circuit, in an unpublished *per curiam* opinion, in the following manner:

> The Court of Appeals of Montgomery County stated in *Thompson v. New York Life Insurance Co.,* No. CA 11416, 1989 WESTLAW 148033 (Dec. 4, 1989) that an affidavit alone cannot establish the final elements without pointing to evidence that establishes some relationship between the "past infirmity allegedly omitted from the application and the infirmity forming the basis of the claims." *Thompson,* 1989 WESTLAW 148033 at * 5.

> . . . . .

> We also hold that Golden Rule has met the requirement set forth in *Thompson* that the omission be material to the claim. Michnay [the insured] did not disclose his extensive medical history regarding heart and blood pressure problems. The claim in question involves three surgeries to repair damage to

Michnay's circulatory system. Clearly, the omitted material would have been material to the issuance of a policy covering such closely related surgeries.

*Golden Rule Insurance Co. v. Michnay,* Nos. 90–3276, 90–3291, 936 F.2d 573 (6th Cir. June 24, 1991) (1991 WL 112810, WESTLAW text at 5) The plaintiff argues that the materiality requirement set forth in *Thompson* is an incorrect interpretation of the law, is of little precedential value and should be disregarded by this court. This court, after careful consideration, agrees.

In this instance we are confronted with a statement of law contained in an unpublished opinion by an Ohio appellate court. That statement of law was also utilized by the Sixth Circuit, in an unpublished opinion, in which the propriety of that Ohio ruling was not directly in issue. In *Golden Rule,* the Circuit was favored with a case in which the facts neatly dovetailed with those required by the *Thompson* court. Here, however, we are asked to determine whether the *Thompson* court's interpretation of the statute at bar was correct. This court believes that it was not.

 As a federal court applying state law, it is incumbent upon this court to follow the precedent of the state's highest

---

8. It should be noted that this court's reading of the *Pope* case, cited by the *Thompson* court, reveals little reason to accept that case as standing for the proposition advanced by the *Thompson* court. In *Pope,* the insured answered "yes" to the question whether he and his family were "now in good health and free from any physical or mental impairment." 120 Ohio App. at 396, 202 N.E.2d 708. The insurer defended a claim for benefits on the basis of the statute at issue here and the trial court granted judgment in its favor. 120 Ohio App. at 395, 202 N.E.2d 708. On appeal "[i]t [was] the contention of plaintiffs that Pope gave a truthful answer when he stated ... that he and Mrs. Pope were in good health and free from any physical and mental defects." 120 Ohio App. at 399, 202 N.E.2d 708. After reviewing the evidence and concluding that "there is a total lack of evidence" indicating that the plaintiffs were in poor health, the court noted:

> there is the further fact, not in dispute here that whatever the physical condition of the Popes may have been on and prior to [the

date of application], it had nothing to do with causing the present claims to arise.

120 Ohio App. at 400, 202 N.E.2d 708. The court concluded its analysis with this statement, "Thus, it appears that there is an absence of evidence which calls into question the truthfulness of the answer given to question No. 6." *Id.* The *Thompson* court, apparently looking to the above indented quote, cites *Pope* as standing for the proposition that a misrepresentation is material only if it is related to the insured's claim. This, it is believed, clearly misconstrues the *Pope* opinion. The above-quoted language is taken from that section of the opinion dealing with the question of whether the insured's statements were false in the first instance. In other words, the *Pope* quotation is merely a *factual* finding (not a statement of the law) which was considered in an analysis of the first element of the statutory test, *viz:* "that such false statement is willfully false." Ohio Rev.Code § 3923.14. The language receives no treatment in the headnotes and is clearly not addressed to the materiality requirement of the statute. *Pope* is inapposite.

court. *Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir.1987). When, as is the case here, the Ohio Supreme Court has not addressed the issue before the court, "the opinions of intermediate appellate courts provide the next best indicia of the state's position." *Matulin v. Village of Lodi*, 862 F.2d 609, 616 (6th Cir.1988) These opinions control "unless other persuasive factors convince the federal court that the state's highest court would disagree with the appellate court determinations." *Id.* This rule applies regardless of whether the appellate court decision is published or unpublished. *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989) [9] Here, of course, we are beneficiaries of an opinion by an Ohio appellate court and, as such, are obligated to follow its precedent absent persuasive countervailing arguments which convince this court that the state's highest court would rule to the contrary. In predicting how a state's highest court would rule, that court's denial of leave to appeal is relevant to our prediction. *Ruth v. Bituminous Casualty Corp.*, 427 F.2d 290, 293 (6th Cir.1970). If the state court's interpretation of a statute is as logical as another advanced by a litigant, the state court's interpretation of the statute must govern. *Matulin v. Village of Lodi*, 862 F.2d at 616. In making our prediction we may also look to "policies underlying the applicable legal principles, and the doctrinal trends indicated by these policies." *Janikowski v. Bendix Corp.*, 823 F.2d at 948 (6th Cir.1987). In so doing, we are, of course, permitted to look to decisions of other states. *Matulin*, 862 F.2d at 616. The court shall address these factors *seriatim*.

■ The Supreme Court denied a jurisdictional motion for appeal of the decision in *Thompson*. 50 Ohio St.3d 708, 553 N.E.2d 689 (1990). That decision, however, cannot and should not be construed to indicate the Ohio Supreme Court's agreement of disagreement with the reasoning or re-

sults reached by the *Thompson* court. In Ohio, the Supreme Court has appellate jurisdiction in, among other things, "[c]ases involving questions arising under the constitution of the United States or of this state", "cases of public or great general interest" at the option of the court, or where a case is certified to the Supreme Court by an appellate court as being in conflict with another decision of an appellate court. Ohio Const. art. IV, § 2(B)(2)(a)(iii); (B)(2)(d) and (e). The Court's decision to overrule motions seeking to invoke that jurisdiction does not indicate the Court's view on the reasoning of the lower court. Rather, it is simply a determination by the court concerning whether it possesses jurisdiction to address that reasoning. *See Keesecker v. McKelvey Co.*, 141 Ohio St. 162, 169, 47 N.E.2d 211 (1943):

> The fact that this court overruled the motions to certify did not necessarily imply that it approved the judgments of the Court of Appeals. It should be understood that the overruling of a motion to certify the record does not constitute an affirmance of the judgment of the Court of Appeals, but is indicative that the court does not consider the controversy one of public or great general interest within the meaning of Section 2 and 6, Article IV of the Constitution of Ohio.

*Id.* In light of this authority, one cannot conclude that the Ohio Supreme Court's decision to overrule the jurisdictional motion in this case is indicative of its views on the materiality requirement as articulated by the *Thompson* court.

■ This court's greatest difficulty with the *Thompson* court's view of the materiality element lies in the fact that its reasoning has no foundation in the language of Section 3923.14. That section states that rescission may be appropriate if the falsification "materially affects either the *acceptance* of the risk or the *hazard*

---

**9.** This rule, apparently, places this court in a position inferior to that of both Ohio appellate courts and common pleas court on questions of state law. In Ohio, the unpublished decision of an Ohio appeals court is not binding authority

on *any* court and is considered persuasive authority only in the judicial district in which it was decided. Ohio Supreme Court Rules for Reporting Opinions, Rule 2(G)(1).

assumed by the insurer." Ohio Rev.Code § 3923.14 (emphasis added). By its plain language, the statute dictates that the falsification is material if it significantly affects either acceptance of the risk by the insurer or the hazard assumed by the insurer. The temporal focus of our inquiry should thus be directed to the time of application. An egregious falsification can, surely, significantly affect either the insurer's acceptance of the risk (i.e. issuance of the policy at hand) or the hazard assumed by the insurer (i.e. the underwriting of a person suffering an undisclosed malady). Simply put, we look to whether the falsification affects the acceptance or the hazard. If so, it is material. *Thompson*, on the other hand, prescribes that materiality may only be established if "there is some relationship between the past infirmity allegedly omitted from the application and the infirmity forming the basis of the claim." 1989 Ohio App.LEXIS 4554. In other words, materiality is determined by the claim made by the insured *after* his fraud. Despite the statute's clear indication that materiality is determined by the effect of falsification upon either the insurer's acceptance of the risk or the hazard it has assumed, *Thompson* looks beyond that time frame and attends solely to the claim made by the insured vis-a-vis his falsification. The flaw in this "interpretation" is apparent from both the wording of the statute (which makes no mention of the claim made by the insurer), and, as well, some application of logical reasoning.

If, for instance, an insurance applicant knew that he was infected with the HIV virus and fraudulently omitted that fact in response to an application question, the statute dictates that that omission would both "materially affect ... the acceptance of the risk" and the "hazard assumed by the insurer" because the insurer would be both much less likely to issue the same policy due to that infirmity and would subject itself to a much greater hazard. For these reasons alone, the insurance applicant's misrepresentation is material. Neither the statute, nor common sense would dictate that the applicant's fraud should be considered immaterial if his or her eventual claim under the statute is one unrelated to the AIDS. In other words, if the insured was hit by a bus, his failure to indicate his HIV status would still remain material because that status would greatly affect the insurer's acceptance of the risk (i.e. issuance of the policy in the same form) and because it would greatly affect the hazard assumed by the insurer (i.e. the risk and expense to which it was exposed). Thus, it seems clear that materiality under Section 3923.14 is unrelated to the eventual claim made by the insurer.

The *Thompson* court's requirement that materiality be dependent upon the claim made by the insured also cultivates another, likely unintended result. In Ohio, § 3923.14 is the statute permitting insurance rescission based upon fraudulent misstatements. Under a *Thompson* analysis, if an insurer learned of numerous flagrantly false statements one week after the policy issuance, they would be compelled to wait to rescind that policy until the insured made a claim. At that point, the fraudulent plaintiff, whom the *Thompson* court is apparently attempting to protect, would have relied upon his potentially revocable policy and would have foregone attempting to secure valid, albeit more expensive, protection from another insurer.

Finally, this court believes that the *Thompson* court's view of the materiality requirement is clearly at odds with the policy underlying the statute and the trends of contemporary case law dealing with insurance rescission. As noted by the Ohio Supreme Court, "[o]ne of the elementary principles of insurance law is that nothing more completely vitiates an insurance contract than false answers to material questions in the application." *Redden v. Constitution Life Ins. Co.*, 172 Ohio St. 20, 24, 173 N.E.2d 365, 367 (1961). As has been more recently noted by an Ohio appeals court:

> There is, however, one important distinction to be noticed between the ordinary contract and the insurance policy. The law has recognized that the practicalities of the situation place an insured and insurer in a much different position than

are most contracting parties. The insurer, at least under a policy such as that here involved where there is no medical examination, must look to the insured for all the information on which it is to consider the issuance of the policy. Insured, in turn, is entering into a somewhat particularized type of contract and may justifiably expect treatment such as that circumstance dictates. With the utmost correctness the United States Supreme Court has accordingly called attention to the fact that:

> Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting that risk, of which he is aware, makes the contract voidable at the insurer's option.

The relationship which existed between [the insured and the insurer] ... placed total reliance on the information received from the insured. Consequently, the relationship was fiduciary in nature and "require[d] of the parties the utmost in good faith in their dealings."

*Buemi v. Mutual of Omaha Ins. Co.*, 37 Ohio App.3d 113, 116, 524 N.E.2d 183 (1987) (quoting *Prudential Ins. Co. of America v. Carr*, 94 Ohio Law Abs. 385, 388, 30 Ohio Ops.2d 373, 374–75, 199 N.E.2d 412, 414 (1964); *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928)).

■ In light of this relationship, it seems clear that the Ohio statute intends to protect the insurer from a fraudulent application and, by imposing the materiality requirement, protect the insured from unwarranted rescission for minor misstatements. The law governing insurance policies, contracts *uberrimae fidei* (literally of most abundant faith), should reward the honest and punish the dishonest. The *Thompson* court's interpretation of the materiality requirement, in this court's view, does just the opposite. A requirement of connection between the falsehood and the claim of the insured leads inevitably to the results that a dishonest applicant would assume no risk by his duplicity unless he haplessly succumbed to the very condition he concealed. The causal connection requirement encour-

ages insurance applicants to take the chance that their dishonesty will not be discovered. He will still be covered by insurance even if, had he been honest in the first instance, he would never have received any (or the same) coverage. The honest applicant, on the other hand, is denied the same coverage which the dishonest person can keep, even after the dishonesty is discovered. Honest policy holders are then forced to pay higher premiums by virtue of the fact that insurers are forced to pay for policies procured by false statements. It is incomprehensible that the Ohio legislature would intend that result without so stating. The courts construing statutes similar to Ohio's have come to the same conclusion.

The causal connection rule articulated by the *Thompson* court "places the policy applicant in the position of being able to gamble that he or she will not sustain a loss caused by the existence of the fact misrepresented ... On the other hand, the honest applicant who has the same facts to reveal will be denied insurance because of telling the truth." *Southern Farm Bureau Ins. Co. v. Cowger*, 295 Ark. 250, 255, 748 S.W.2d 332, 335 (1988). As restated by the Second Circuit:

> [the causal connection rule] would reward the practice of misrepresenting facts critical to the underwriter's task because the unscrupulous (or merely negligent) applicant "would have everything to gain and nothing to lose" from making material misrepresentations in his application for insurance.

*Mutual Benefit Life Ins. Co. v. JMR Electronics Corp.*, 848 F.2d 30, 34 (2nd Cir. 1988). Due to this anomolous result it is virtually a foregone conclusion that:

> where the applicable misrepresentation statute does not expressly provide that the matter misrepresented must actually contribute to a loss in order to furnish a basis for policy avoidance, *the courts have refused to impose such a requirement as a matter of construction.*

William H. Danne, Jr., Annotation, *Modern Status of Rules Regarding Materiality*

*and Effect of False Statements By Insurance Applicant as to Previous Insurance Cancellations or Rejections,* 66 A.L.R.3d 749. By example, one case is particularly instructive.

In *Jeffe v. Monarch Life Insurance Co.,* 123 F.Supp. 173 (D.Conn.1954), the insured falsely stated in his application that he had neither applied for a policy nor been rejected by an insurer. After the plaintiff/insured applied for and began receiving disability benefits, the insurer discovered his prevarication and brought a rescission action. Significantly, the Connecticut statute governing rescission contained the same materiality requirement as now required in Ohio. The statute stated: "[t]he falsity of any statement in the application for any policy ... may not bare the right to recovery thereunder unless such false statement *materially affected either the acceptance of the risk or the hazard assumed by the insurer.*" 123 F.Supp. at 174. The court framed the issue before it in the following manner:

> The question, therefore, presented by the motion for summary judgment is whether or not the facts of the case, the particular misrepresentations should be found material under the terms of the Connecticut Statute as a matter of law.

*Id.* The court continued:

> The test of materiality is in the effect which the knowledge of the fact in question would have on the making of the contract. To be material, *a fact need not increase the risk, or contribute to any loss or damages suffered. It is sufficient if the knowledge of it would influence the parties in making the contract.*

*Jeffe,* 123 F.Supp. at 175. The court held that omission of the prior rejections (which clearly would not contribute in its own right to the claim made) was material as a matter of law. *Id.*

■ On the basis of the reasoning reflected above, this court is persuaded that the Ohio Supreme Court would decline to follow the test for materiality articulated by the *Thompson* court. Accordingly, this court holds that the test for the materiality

is not dependent upon the claim made by the insured, but is, as the statute dictates, determined by analyzing the effect of the falsification upon the underwriting decision.

■ With this established, we must now apply the Ohio statute as it is written. The plaintiff herein makes no claim that the hazard it assumed was increased by the defendant's fraudulent misrepresentation. Indeed, the facts discourage, if not negate altogether such a contention. Thus, we must determine whether the defendant's prevarication materially affected *the acceptance* of the risk by the insurer. Ohio Rev.Code § 3923.14. It seems quite clear that our answer must be in the affirmative. Defendant answered "no" to several questions which, as no one could seriously dispute, are highly relevant to a disability underwriting inquiry. The Defendant contends that:

> it is not enough that the information would have been *considered* by the company in making a decision as to whether or not to accept the risk. The information must have been such that it would have produced a "material influence upon or alteration in" the company's decision.

(Defendant's Post–Trial Brief, Docket # 179 at 3) The court is in complete agreement with this statement. In other words, the statute mandates that plaintiff's acceptance be significantly affected by defendant's misstatement. The defendant continues, however:

> It [the falsification] must have been such that the company would not have done what it did without knowledge of that information. It must have been such that, instead of issuing the policy, the company, had it known the information would have rejected the policy.

*(Id.)* *(See also* Response to Plaintiff's Post–Trial Brief, Docket # 183 at 4) ("Information is not 'material' for purposes of rescission, unless it would cause the company to reject the policy.") The court believes these statement goes too far. The materiality requirement asks only if the misrepresentation significantly affected ac-

**1300**

ceptance of the policy. A significant effect can surely be something less than outright *rejection.* Indeed, if materiality required rejection, the fifth element of the rescission test would be superfluous. *See* Ohio Rev. Code § 3923.14 ("but for such false statement, the policy would not have been issued.")

In the case at bar, the defendant applied for disability benefits and incorrectly answered questions which asked whether he had ever consulted a physician for coronary symptoms (i.e. elevated blood pressure, rheumatic fever, heart murmur, chest pain, angina, heart trouble, stroke or irregular pulse). The defendant also denied ever having had a diagnostic test for these symptoms. When one considers that Mr. Wittman was applying for disability benefits, the significance of his false statements is so self-evident that their materiality should be presumed as a matter of law. *See e.g., New York Life Ins. Co. v. Goerlich,* 11 F.2d 838 (6th Cir.1926) (failure to apprise insurer of previous application rejection by another insurer due to heart condition held "material as a matter of law" under the predecessor statute). Nevertheless, had Mr. Wittman been truthful, N.Y. Life would, at the very least, have asked for his medical records and would clearly have viewed his application in a significantly different light. Indeed, the very crux of this suit is that they would have rejected his application. The defendants, on the other hand, concede that New York life would have asked for his records but urge this court to find that Mr. Wittman's prevarication would have induced the plaintiff to conduct a further investigation of his medical background and would have led to the conclusion that his symptoms created no increased risk. (*See* Defendants' Post Trial Brief at 5) ("What Defendant is saying is that New York Life *would* have investigated further.") (emphasis in original) Under either paradigm, it seems clear that a truthful answer would have significantly affected plaintiff's acceptance of the risk. The case law bears out this conclusion. *See Hawkeye–Security Ins. Co. v. Government Employees Ins.*

*Co.,* 207 Va. 944, 948, 154 S.E.2d 173, 176 (1967):

> Government employees was entitled to know the whole truth. The *false answer to question No. 7 caused the Company to forego an opportunity to investigate why the State Farm policy was cancelled and to determine whether or not the risk would be assumed as well as the premium rate applicable to the risk in the event the policy was issued.* ... Under the evidence adduced, the trial court properly held that the misrepresentation was material to the risk when assumed and that the policy was null and void *ab initio* for that reason.

*Id.* (emphasis added). This court is firmly convinced that Mr. Wittman's false statements significantly affected New York Life's acceptance of the risk and were thus material as that term is defined in the Ohio statute.

ii. *Inducement*

This court is equally convinced that the false statements on the application induced the insurer to issue the policy at hand. Apparently, the defendants concede as much. (*See* Response to Plaintiff's Post–Trial Brief, Docket # 183 at 2) ("It is Defendants' position that New York Life has failed to prove either the first or the third of these three [statutory] requirements.") The testimony overwhelming proves that Mr. Wittman's failure to answer "yes" to the relevant questions rendered his application "fairly clean". It was not totally "clean" due to the defendant's previous laminectomy. As the testimony indicated, the underwriter's manual specifically covered this condition and permitted assumption of this risk with a rider excluding laminectomy-related disabilities. (T. at 108) Thus, apart from defendant's laminectomy, his application was entirely "clean". (T. at 216) Plaintiff's underwriter then issued this policy relying upon the validity of the remaining application answers. (T. at 218, 274) In other words, the issuance of *this* policy was induced by defendant's omission.

### iii. The "but for" Test

This portion of the statutory test asks whether, "but for such false statement the policy would not have been issued." Ohio Rev.Code § 3923.14. As this court, and apparently both parties agree, this element asks whether truthful answers would have resulted in the insurer's refusal to issue this policy. *See, e.g., Buemi,* 37 Ohio App.3d at 120, 524 N.E.2d 183 ("had Mutual of Omaha been apprised of Buemi's previous medical history at the time the application was completed the policy would not have been issued.") The difficulty with the applicability of this test is that it compels a court to determine what would have happened had the truth been forthcoming in the first instance; it demands a hypothetical conclusion based upon present and proven facts.

As a starting point, an elementary inquiry must ask whether a truthful answer by the defendant would, in and of itself, result in declination. In many cases, a court need not look further. For instance, if a proposed insured falsely answered that he did not have leukemia, a minor inquiry could determine whether the policy would have issued had the answer been given truthfully. Here, however, we are primarily concerned with the defendant's false answer to two collateral questions, to wit: "during the past 10 years has any such person consulted a practitioner for or been treated for or had heart murmur, chest pain, angina, heart trouble or irregular pulse?, and "has any such person within the past 5 years had an electrocardiogram, x-ray or other diagnostic test". These questions are clearly not directed to the state of the applicant's health but rather to the testing which goes to the discovery of medical difficulties or to the treatment of symptomologies. On the basis of these questions and the evidence presented at trial, it is difficult, if not impossible, to conclude that had defendant given truthful answers on his application his application would have been rejected outright. Had Mr. Wittman been truthful, he would have checked "yes" to these inquiries and would have listed, in an exceedingly small space, his best recollection of these consultations.

Had that been done, it seems quite clear that the underwriters of New York Life would have requested the applicant's medical records. Indeed, the testimony and all parties' briefs reveal that plaintiff's entire case is built upon access to Mr. Wittman's medical records. *See e.g.,* Gillette Testimony, T. at 272:

Q: Mary, as an underwriter, calling upon your experience, your medical impairment manual from New York Life, calling upon your underwriting judgment, when you see that there is no clinical disavowing, no clinical finding hard and fast by Dr. Kennedy that Mr. Wittman does not have sick sinus syndrome, *without seeing in the records* any complete understanding or clinical opinion as to the cause or symptomatology, calling upon your experience as an underwriter, what do you do?

A: If I can't evaluate the risk, I can't issue a policy.

Thus, this court is asked to determine what New York Life would have done had Mr. Wittman given truthful answers and had the underwriter asked for an attending physician's statement.

At this point, our inquiry again becomes hypothetical in nature. This court is not privy to any testimony indicating with exactness what that attending physician's statement would include; due, no doubt, to the fact that these statements vary from case to case. (*See* Gillette Testimony, T. at 299 (no particular form for attending physician's statements) It is clear, however, that the attending physician's statement would likely include the medical records of the insured. (T. at 222) We then must ask what Ms. Gillette would have done with these records.

To begin, we must first look at the character of these records. There is no doubt that a series of complaints by the defendant suggestive of an undiagnosed heart condition. They also reveal a series of notations stating that defendant had sick sinus syndrome. The records also reveal a series of tests which were, no doubt, directed toward determining the cause of those complaints. The first of these tests was

interpreted as suggestive of sick sinus syndrome. There was no clinical *diagnosis* of sick sinus syndrome. (*E.g.,* Gillette Testimony, T. at 270–271) The remaining tests (which constitute the overwhelming majority of these tests) indicated heart normality. There is no record notation that plaintiff was not suffering from sick sinus syndrome. (*E.g.,* Gillette Testimony, T. at 272) We must now determine what Ms. Gillette would have done had these materials been contained in plaintiff's *application* file. That answer to this question is case dispositive.

The testimony of Ms. Gillette and Mr. Bottega indicate that they would have declined the policy immediately upon review of the records due to the series of symptoms, suggestive of an underlying and undiagnosed heart condition and the putative diagnosis of sick sinus syndrome. The court is not convinced that this is the case because the evidence shows that the conditions indicated by the records (save for a *diagnosis* of sick sinus syndrome; which is not indicated) do not, ipso facto, render an applicant not insurable under New York Life's guidelines. Here we refer to the Gillette testimony:

Q: And certain types of chest pain can be issued standard policy?

A: That's correct.

Q: All right, and therefore in order to know what you would do with an applicant with a history of chest pain, you'd have to investigate the type of chest pain?

A: Depending on what kind of medical information came in with the application. I may have the information I needed.

Q: You'd have to know what type of chest pain?

A: Oh, absolutely.

. . . . .

Q: So, it's possible, isn't it, that he had the kind of chest pain that would have, as far as that symptom is concerned, have allowed issuance of this policy standard?

A: It's possible.

. . . . .

Q: And an application that discloses a history of tachycardia would not be rejected automatically, would it?

A: No, it would not.

Q: And the reason for that is that the manual permits the issuance of a policy to an applicant with a history of tachycardia?

A: Under certain conditions, yes.

. . . . .

Q: That means you don't know whether or not his tachycardia fell within the guidelines that would have permitted issuance of the policy standard, does it?

A: No; I cannot answer that question. I don't know.

Q: And you didn't investigate it?

A: No, I did not.

Q: And your manual has specific references to a specific page dealing with premature atrial contractions, doesn't it?

A: That's correct.

Q: And it distinguishes between those applicants that present with that kind of history without an electrocardiogram and those with a favorable electrocardiogram; doesn't it?

A: That's correct.

Q: And there are circumstances under which a policy to such an applicant can be issued standard, even with that history, isn't that true?

A: That's true.

Q: Now, do you know where the premature atrial contractions reported years ago for Dave Wittman fit as far as the guidelines of your manual are concerned?

A: I didn't review my manual for the PAC's.

Q: You didn't refer to the manual for the PAC?

A: Not to make my final decision, no.

Q: Nor did you refer to the manual for tachycardia?

A: That's correct.

Q: Nor did you refer to the manual for the chest pain?

A: That's correct.

(Gillette Testimony, T. at 302, 304–05, 305–06)[10] (*See also* Bottega Testimony, T. at 462 (admitting the same)).

The most serious disclosure in Mr. Wittman's records is that of sick sinus syndrome. This syndrome is nowhere specifically addressed in the New York Life Manual, but is instead, a footnoted under a section dealing with sinus bradycardia. Interestingly, Sinus bradycardia, as the Manual indicates, "is fairly common in healthy young adults, especially well-trained athletes ... [i]n healthy people with a normal ECG this condition can be ignored." An asterisk footnote at the bottom of this page states: "if any indication of complete AV heart block or sick sinus syndrome, decline." (Plaintiff's Exhibit 20, at III–13) As has been previously noted, sick sinus syndrome was not, as Ms. Gillette admits, clinically diagnosed. Rather, it is noted in plaintiff's medical history and is suggested by the first cardiac test relevant here. It was, as Ms. Gillette admits, merely "possible". (T. at 305) Keeping in mind that repeated cardiac tests revealed complete heart normality, we must now ask what Ms. Gillette would have done. Would she have immediately declined this policy? This court is not convinced that she would have done so.

The testifying underwriters at New York Life admitted that they were not "medical experts." (*E.g.* Gillette Testimony, T. at 308) Indeed, the testimony indicates a significant degree of medical ignorance. (*Cf.* Bottega Testimony, T. at 494 "normal EKGs and the normal stress tests and the normal thallium scan report does not rule out sick sinus syndrome; is that your testimony? A: That's correct."; Dr. Kennedy Testimony, T. at 129 "He does not suffer from sick sinus syndrome ... [b]ecause all the cardiac testing we did really failed to substantiate that diagnosis."[11]) For instance, Ms. Gillette indicated, that although the "any indication of sick sinus syndrome" mentioned in the guidelines meant a working or clinical diagnosis, she did not know how sick sinus syndrome was diagnosed. (Gillette Testimony, T. at 308) Mr. Bottega testified to the same effect. (Bottega Testimony, T. at 452) In light of the underwriter's lack of medical knowledge, and the plethora of normal test results shown in the medical files of Mr. Wittman, Ms. Gillette and Mr. Bottega's testimony that they would have rejected the claim outright seems implausible. In fact, it seems quite clear that Ms. Gillette would, at the very least, have recommended consultation with New York Life's Medical Department. The testimony at trial bears this out.

As Ms. Gillette indicated at trial: "I have the right to send that file to the medical department, not only the right, *it's suggested if I don't know what I'm dealing with, then I want some higher authority to assist me.*" (Gillette Testimony, T. at 96) This, of course, neatly connects with Ms. Gillette's reasoning for her conclusion that she would have declined the defendant's application based upon her review of his medical records. As Ms. Gillette repeatedly noted, the symptoms complained of by defendant caused her "concern because I do not know what I'm dealing with. I can't assume a risk that I'm not sure of." (Gillette Testimony, T. at 232) It seems quite clear that Ms. Gillette would have recommended that defendant's file be sent to the medical department. (*See* Gillette Testimony, T. at 96). Over the objection of New York Life counsel, Ms. Gillette indicated as much:

Q: And under those circumstances [not having a firm diagnosis], you would have

---

**10.** Ms. Gillette's reasoning for this action is succinctly described by her as follows:

I've just told you, Mr. Scanlon, I used the whole picture. I did not investigate each and every condition. I had complete picture of some kind of heart problem with possible sick sinus syndrome. I did not have to break down each condition.

(Gillette Testimony, T. at 305).

**11.** *See also* Tsai Testimony, T. at 80:

Well, I think you're getting this a little confused. You need the EKG and Holter tests to make a diagnosis that your talking about. And they're fundamental to make the diagnosis because they're based on both clinical grounds and the objective evidence of the EKG, but *no test in medicine is 100 percent accurate.*

asked for further investigation; am I correct?

A: I'm not sure if we would have asked for further investigation. We would have asked for—

MR. GOOD: Object.

Q: From the medical department?

A: Yes.

(Gillette Testimony, T. at 296).

Mr. Bottega, Ms. Gillette's superior and that person who admittedly could disregard her recommendation for medical review, testified that he would not have referred this case to medical for a recommendation. This court does not accept the veracity of that testimony. Mr. Bottega's testimony reveals that he likewise has little medical knowledge. He, albeit hesitantly, stated on cross-examination that an application with a history of tachycardia, premature atrial contractions and chest pains could be granted coverage. Again turning to sick sinus syndrome, Mr. Bottega admitted that he did not know how sick sinus syndrome was diagnosed, but also admitted that he would have referred the file to medical if he had a lot of information to negate such a diagnosis. At this point the testimony becomes rather interesting:

Q: Okay. But the difficulty that I'm seeing here is that since you don't know how sick sinus syndrome is diagnosed and you don't know the significance of the EKG's and stress tests, you didn't know that you had information in your file that negated the diagnosis of sick sinus syndrome, did you?

A: That's not correct here. First of all, the matter involving sick sinus syndrome is just one matter.

I mean, we have a multiplicity of other symptoms. I mean, if sick sinus syndrome and that particular question was answered in the context that that was the only matter that we had to firm up.

Q: You had a multiplicity of symptoms?

A: Right.

Q: And that's why you recommended denial of the policy?

A: That's correct.

Q: Well, we agree that you mentioned only four on the April 19 opinion.

A: Correct.

Q: And for gosh sakes, Mr. Bottega, by June 5th when you sent this case to the medical department you mentioned only one?

. . . . .

Q: When you referred the case to the medical department in June of '89 the only reason that you told them that you had recommended rescission of the policy was for a diagnosis of sick sinus syndrome; isn't that correct?

A: That's correct.

(Bottega Testimony, T. at 468–69) This testimony establishes that the presence of sick sinus syndrome was, and rightly so, quite important to Mr. Bottega. But it also establishes that Mr. Bottega did not know how that condition was diagnosed. One cardiac test suggested sick sinus syndrome. Subsequent cardiac tests showed normality. In light of the fact that the other conditions suffered by defendant would not, necessarily, lead to automatic denial of coverage absent further investigation, this court's application of logic dictates that Mr. Bottega would want to discern whether an *insurance applicant* did in fact suffer from sick sinus syndrome, or at least the meaning of subsequent cardiac tests. This, it appears, would be especially true in light of Ms. Gillette's testimony that she would recommend reference of the file to the Medical Department and Mr. Bottega's admission that the presence of a number of indicators that would negate a diagnosis of Sick Sinus Syndrome would result in a reference of the file to the Medical Department. This court is of the opinion that the evidence proves that plaintiff's underwriters would have referred this case to the medical department. The testimony of Dr. Kost support this view.[12]

12. Dr. Kost was, in addition to Dr. Kennedy, a straightforward and credible witness. Their demeanor was frank, and their testimony, even on cross-examination, did not result in oblique answers to compelling questions, attributes which other witnesses lacked to a significant degree. It is also worth noting that the cross-examination of Mr. Krinik leads this court to question

Dr. Kost was vice-president and medical director for John Hancock Insurance and is now, on a consultative basis, medical director of the Hudson, Connecticut National and Signa insurance companies. When asked what conclusion a reasonably prudent and experienced underwriter could make on the basis of the defendant's records, Dr. Kost answered: "I don't think a lay underwriter could reach a final conclusion." (Kost Testimony, T. at 626) What would they do?, he was asked. His answer: "[they] would have led the underwriter to obtain these records, to obtain consultation from the medical department as to the significance of these records, and then take action based upon the medical department advice." (*Id.*) When asked what that advice should have been, Dr. Kost, a medical director in his own right, responded: "It should have been to obtain a current electrocardiogram, possibly to request with regard to symptoms immediately prior to the application, and I believe it would have led to a recommendation to issue the policy as it had been issued." (Kost Testimony, T. at 626–627) [13] Why would the policy have been issued as is?, he was asked. He responded:

I believe that the records as they present themselves do not have a basis for believing that this man has sick sinus syndrome or underlying coronary artery disease.

Because they're conflicting and because they're not quite complete in every

note, I think that only the most experienced underwriter would be able to fully evaluate that.

By that, than an experienced medical director on seeing these records would conclude that there is no significant evidence of sick sinus syndrome or of underlying heart disease.

Very commonly, when there's been a history of stutters or heart disease, an electrocardiogram is obtained. People don't want to feel foolish from not having gotten an electrocardiogram which is easy and inexpensive.

I know from the record there was a subsequent electrocardiogram that was normal.

(Kost Testimony, T. at 627) The examination continued:

Q: Now Dr. Kost, if a resting electrocardiogram had been performed on April 1988 or shortly thereafter in conjunction with the application for this policy, what is your opinion based upon reasonable medical certainty as to what that electrocardiogram would have shown?

A: I have no reason to believe it would not be normal

. . . . .

There's nothing in the records we've discussed to indicate there's any further likelihood of heart disease which might affect the electrocardiogram.

---

Mr. Krinik's credibility. In sum, he exhibited some attributes as something more than a retained witness for hire.

**13.** Plaintiff makes much of the fact that Dr. Kost's testimony relating to issuance of the policy was given from a medical rather than an underwriting standpoint. Admittedly, each company makes its own risk evaluation and, at New York Life, issuance of the policy is committed to the underwriters alone. However, one must question what a medical department is for, if not to advise non-medical underwriters on the risks presented by an applicant's health. As Dr. Kost's vast experience illustrated, medical departments:

provide training and assistance to the health underwriters. The medical department was responsible for developing the medical under-

writing standards. By that I mean delineating those conditions that are important in underwriting health insurance, the approach to investigation and underwriting of conditions, evaluation of those medical impairments as exist.

(Kost Testimony, T. at 600) This testifying medical director found no appreciable risk of coronary disease. Had Ms. Gillette or Mr. Bottega contacted their own medical department *at the time of application* and had that department engaged in a review of Mr. Wittman's *complete* file (as Bottega said they should), presumably their conclusion would not differ substantially from Dr. Kost's. The question then becomes not whether the underwriters had the *authority* to disregard the medical department's advice (for they clearly did), but rather whether they would choose to exercise that authority.

(Kost Testimony, T. at 630–31) [14]

Ms. Gillette also testified that she occasionally, by writing, asks the attending physicians for clarifications of their records. (Gillette Testimony, T. at 300) N.Y. Life, after their initial decision to rescind did, however, ask for a statement from Dr. Kennedy, and that statement did indicate that Mr. Wittman had a heart disease. It is quite clear, however, that had Dr. Kennedy been more well-spoken, his answer would have indicated the opposite. He did not believe Mr. Wittman had an underlying heart disease, a belief confirmed by all the other doctors testifying in this case. Thus, although we do not know what Dr. Kennedy would have said, it could quite easily not have been the same information conveyed in his rescission statement to New York Life.

■ What can we deduce from this testimony? First, that had Mr. Wittman given truthful application answers, his medical records would have been obtained by the underwriter. Second, the underwriter would have obtained an opinion from the medical department of her company, from the attending physician, or both. Third, a medical expert's review of the records indicates no underlying heart disease of sick sinus syndrome, and no reason to believe a cardiac test at the time of application would make a finding to the contrary. These facts, the court believes, are well established. In light of this, the court also possesses some certainty that the New York Life Medical Department, *at the time of application,* would have concluded that the plaintiff presented no significant coronary risk.[15] If that were the case, logic dictates that the underwriter would follow that advice and issue the policy in the same form. Although this analysis may needlessly extend beyond the point required, it is important in one critical respect. That point relates to the burden of proof the legislature has placed upon the plaintiff/insurer. Here, the court must reiterate that New York Life must produce in the mind of this court a *firm belief or conviction* that but for Mr. Wittman's false statement the policy would not have been issued. Ohio Rev.Code § 3923.14 This, they simply have not done. In fact, this court believes that there is significant reason to believe the opposite. As such, the plaintiff has not met its burden of proof on the final element of Ohio's statutory test for rescission of this insurance policy. As such, this court must grant judgment in favor of the defendant.

### III. CONCLUSION

The plaintiff's fraudulent misrepresentation materially affected New York Life's acceptance of the risk entailed by his disability policy and induced the insurer the issue the policy forming the basis of this suit. Nevertheless, the facts elicited at trial lead this court to conclude that had the insured been truthful on his application, the normal condition of the insured's heart would have been discovered by the underwriters at the time of application, leading to the distinct possibility, if not probability, that the policy in question would have been issued in the same form. As such, this court simply cannot be convinced that had plaintiff given truthful answers the policy would have been rejected. Plaintiff's failure to meet its burden of proof on this element of the statutory test mandates a denial of the rescission it seeks. It is important to qualify this conclusion in one respect. This opinion should not be read as standing for the proposition that insurers have a duty to further investigate the health of an insured. Rather, because

14. There is testimony, as indicated in the findings of fact above, that the New York Life Medical Department did review at least a portion of the defendant's files. What their opinion would have been at the time of application, and what their opinion would have been after review of the whole medical file, however, is a matter of conjecture. Significantly, no person from N.Y. Life's medical department testified at trial. We thus must infer what they would have concluded on the basis of the facts presented.

15. Although New York life maintained its rescission posture after its Medical Department's review of the case, that fact raises no more than the barest inference that they believed the plaintiff would have presented a higher risk upon application.

of the unique facts of this case, this court has concluded that the insurer would have conducted an investigation. The medical records of the insured raised questions in the mind of the underwriters that the insured suffered some undiagnosed heart disease and possibly had sick sinus syndrome. Those same records, however, contained facts suggesting the contrary. This court believes, on the testimony elicited at trial, that these contradictions would have prompted further investigation by the underwriters.

Accordingly, judgment on plaintiff's rescission claim is hereby GRANTED in favor of Mr. and Mrs. Wittman.

IT IS SO ORDERED.

## ORDER

Currently before the court is defendants' motion to alter or amend judgment, Docket # 188.

On January 6, 1993, this Court, following trial to the bench, issued findings of fact and conclusions of law finding in favor of the defendant. On that same day, the Court issued a *pro forma* judgment entry which was entered onto the docket in accordance with Fed.R.Civ.P. 58. That latter act was an inadvertent clerical error. By previous, stipulated order of this court, the above-captioned matter was bifurcated. *See New York Life Ins. Co. v. Wittman,* No. 5:89 CV 2446 slip op. (N.D.Ohio June 26, 1991) That order stated, in pertinent part, the following:

> If the Court rules in favor of the Defendants, David and Jean Wittman, on the rescission claim, trial to a jury on the Defendants' Counterclaims will then be scheduled.

*Id.* at 2. Inasmuch as the defendants' counterclaims were still pending at the close of trial to the bench on the rescission claim, entry of judgment was inappropriate.

Accordingly, the defendants' motion to alter or amend judgment, Docket # 188, is GRANTED. The court's judgment entry dated January 6, 1993 is VACATED. This case is REINSTATED.

IT IS SO ORDERED.