**BILL CALL FORD, INC.,
et al., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

No. 5:91 CV 242.

United States District Court,
N.D. Ohio, E.D.

Aug. 18, 1993.

Timothy A. Shimko, Sr., Shimko & Associates, Cleveland, OH, Edward C. Baran, Jr., Baran, Piper, Tarkowsky & Fitzgerald, Mansfield, OH, John P. Calandra, Jr., Baran, Piper, Tarkowsky & Fitzgerald, Thomas G. Lobe, John F. King, Hofelich & King, Cleveland, OH, for plaintiffs.

James B. Niehaus, Daniel W. Hammer, Sr., Michael E. Smith, Thompson, Hine & Flory, Cleveland, OH, for defendant.

## ORDER ADDRESSING COUNT EIGHT

SAM H. BELL, District Judge.

### PREFACE

*The parties have moved for summary judgment on all counts of the complaint. The court has addressed each motion by separate opinion. They are, in essence, a trilogy. Because some orders, for the sake of efficiency, reference others made in this matter, the court suggests that a reader peruse them in the order they were prepared. The order of drafting is this: (1) opinion addressing count eight, 830 F.Supp. 1034, (2) opinion addressing* count six, 830 F.Supp. 1043, (3) opinion addressing counts one, two, three, four, five and seven, 830 F.Supp. 1053.

## I. Introduction

The above captioned matter was commenced with the filing of a complaint in diversity on the fifth of February, 1991. An amended complaint was filed on December 27, 1991. We begin with a summary of plaintiffs' claims.

In their amended complaint, the plaintiffs allege that they were franchised by defendant Ford commencing in 1980 and operated as such at a location in Mansfield, Ohio until mid–1990. (Amended Complaint at ¶ 4) In February of 1989, the plaintiffs purportedly entered into a contract with James Graham, already a Ford dealer in Zanesville, Ohio, for the sale of their franchise to Graham. (*Id.* at ¶ 5) Plaintiffs allege that they provided Ford with all necessary documentation and requested that defendant approve James Graham as a prospective purchaser. Plaintiffs, in count one, claim that Ford, by failing to approve Graham as the successor franchisee, breached a sales and service agreement entered into by the parties, damaging plaintiffs in the sum of two million dollars. For this same act, plaintiffs in count two allege that the defendant "breached the requirements of good faith and fair dealing in performance of its duties with Plaintiff, its franchisee, as required by the laws of the State of Michigan and the laws of the State of Ohio." (Amended Complaint at ¶ 11) In count three, plaintiffs claim that Ford "tortiously, maliciously and intentionally interfered with the contractual arrangements between Plaintiff and Graham." (*Id.* at ¶ 13) In their fourth count, plaintiff alleges that the defendant's actions were "wilful, wanton and malicious and are such that they to as (sic) entitle the Plaintiff to treble damages." (*Id.* at ¶ 15) In count five, plaintiffs aver that the "acts and omissions of the Defendant, in tort and in breach of contract and violation of statutes is such as to entitle the Plaintiff double damages, treble damages, punitive damages and/or attorneys fees in a sum to be determined at trial." (*Id.* at ¶ 17) In count six, plaintiffs seek treble damages for the defendant's failure to ade-

quately compensate plaintiffs for warranty service performed by them on behalf of Ford. (*Id.* at ¶¶ 19–20) In count seven, plaintiffs contend that Ford's failure to timely approve the sale of the franchise to Graham violated Section 4517.56 of the Ohio Revised Code and other provisions of Chapter 4517 of the Code. (*Id.* at ·¶ 22)

In their eighth and final count, plaintiffs aver that Ford's approval of the transfer of the franchise conditioned upon Graham's acceptance of additional terms that were not a part of plaintiff's franchise agreement violated Section 4517.56(F) of the Ohio Revised Code. (Amended Complaint at ¶ 24) Plaintiff claims that "[u]nder the facts and circumstances of this violation of the statutes, the Plaintiff is entitled to double the amount of actual damages from the Defendant." (*Id.* at ¶ 25).

Currently before the court are two motions relative to count eight of the complaint. The first is plaintiffs' motion for partial summary judgment, Docket # 42. The defendant has not responded to this motion. The second motion is the defendant's motion for summary judgment on as to count eight of the complaint, Docket # 106, to which plaintiffs have responded, Docket # 76.[1] These motions are the subject of this opinion.

## II. Standard of Review

In reviewing a motion for summary judgment, a court must consider the pleadings, related documents, evidence, and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979). Rule 56 provides, in relevant part, as follows:

(c) . . .

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

. . . . .

(e) . . .

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Three Supreme Court cases have provided guidance as to the nature of the respective burdens allocated under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The ultimate burden lies with the non-moving party to show the existence of a genuine issue of material fact. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Fed.Rule Civ.Proc. 56(e)." *Matsushita*, 475 U.S. at 586–587, 106 S.Ct. at

---

1. The procedural history of these motions is rather bizarre. Plaintiffs were granted leave to amend their complaint—adding count eight—on December 16, 1991. Plaintiffs' motion, filed on December 5, 1991, preceded the inclusion of that claim in count eight. The defendant moved to strike this motion. That defense motion was denied as moot by the court; which noted in the margins that amendment of the complaint had been had and that plaintiffs' motion for summary judgment would be considered. Following amendment of the complaint, the defendant moved for leave to file an attached motion for

summary judgment as to count eight, Docket # 56. That motion was granted on the twenty-seventh of December, 1991. Nevertheless, some sort of error prevented the defendant's motion and attached brief from actually being entered onto the court's docket. A review of the file and docket has now revealed this error, which has been corrected. Thus, defendant's motion, while submitted to the Clerk's office on the 23rd of December, 1991, was actually filed on July 8, 1993 and therefore bears a docket number greater than the plaintiffs' response to this motion.

1356 (emphasis supplied). "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The court in *Anderson* held that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff had had a full opportunity to conduct discovery." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514.

On the other hand, the moving party's burden under Rule 56 is lighter.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c) ... suggests the absence of such a requirement.

*Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis supplied).

The Sixth Circuit Court of Appeals, in *Street v. J.C. Bradford and Co.,* 886 F.2d 1472 (6th Cir.1989) recently reviewed court decisions and commentary regarding the impact of *Anderson, Celotex,* and *Matsushita* on summary judgment practice. The court concluded that a "new era" in summary judgment practice has opened in the court system as a result of these opinions.

Scholars and courts are in agreement that a "new era" in summary judgments dawned by virtue of the Court's opinions in these cases ... On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact and tended to emasculate summary judgment as an effective procedural device.

*Street, supra,* at 1476.

The court enunciated the following "new era" principles, among others: as on federal directed verdict motions, the "scintilla" rule applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion; the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment"; the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Id.* at 1479–1480 (footnotes and citations omitted).

With these standards in mind, the court shall examine the parties' cross-motions.

### III. Law and Analysis

Although the parties have offered differing translations of the facts relevant to count eight, it seems clear that the facts material to that count are not in dispute. As such, this court is called upon to rule as a matter of law. Such a determination is, of course, dependent upon an analysis of the indisputable facts underlying plaintiffs' eighth claim. What follows is a brief summary of those established material facts.

On October 1, 1980 plaintiffs [hereinafter "the dealer"] and the defendant [hereinafter "Ford"] entered into a Sales and Service Agreement [hereinafter "Franchise Agreement"]. (Defendant's Appendix Exhibit # 1) The Franchise Agreement provided, in pertinent part:

In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred

on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
| --- | --- | --- |
| William J. Call | 6657 Windfall Road, Galion, Ohio | 100% |

(ii) upon the representation and agreement that the following persons(s), and only the following persons(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
| --- | --- | --- |
| William J. Call | 6657 Windfall Road, Galion, Ohio | President |

. . .

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

----

(Defendant's Appendix, Exhibit # 1, Preamble at iii-iv ¶ F) The Agreement also provides that:

The following represent events which are substantially within the control of the Dealer and over which the Company has no control, and which are so contrary to the intent and purpose of this agreement as to warrant its termination or nonrenewal:

(1) Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this agreement; or transfer by operation of law or otherwise, of the principal assets of the Dealer that are required for the conduct of DEALERSHIP OPERATIONS; or any change, however accomplished, without the Company's prior written consent, which consent shall not be unreasonably withheld, in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F.

(Defendant's Appendix, Exhibit # 1 at 15 ¶ 17(b)(1))

In 1986, Mr. Call formally communicated to Ford his desire to sell his dealership.

(Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, Docket # 76 at Exhibit 3) [hereinafter "Docket # 76"] Ford's efforts to find a purchaser were unsuccessful. (Docket # 76, Exhibit 1 at ¶¶ 6, 7) William Call eventually found his own buyer for the dealership, James Graham, and entered into a Buy/Sell Agreement [hereinafter the "Sale Contract"] on February 3, 1989. (Docket # 76, Exhibit 5; Defendant's Appendix, Exhibit 3)

The Sale Contract states:

*Transfer of Franchises*—It is specifically agreed between Sellers and Buyer that they shall mutually pledge their best efforts to obtain the transfer of the franchises (Ford/Chrys) Sellers to Buyer.

(Docket # 76, Exhibit # 5 at 13) On the sixth of February, 1989, Ford learned of the contract in a telephone conversation between one of its officials and Graham. (Defendant's Appendix, Exhibit # 4 at ¶ 2) A copy of the Sale Contract was provided to Ford in a meeting between Graham (the buyer) and the Ford representative on February 9, 1989. (*Id.*)

On February 14, 1989, Mr. Call received a letter from Ford which stated:

It is unlikely that we well be able to approve Mr. Graham's application as the replacement dealer in Mansfield, Ohio prior to March 8, 1989, because we do not have all the information necessary to evaluate the application. Despite increased activity in the Market Representation Department we will endeavor to obtain the necessary information as quickly as possible. Therefore, for the purpose of Section 4517.56 of the Ohio Revised Code, the Company hereby objects to Mr. Graham's application to be the replacement dealer in Mansfield, Ohio. However, upon receipt of all requested information, we will complete our review and inform you of the status of the application.

(Docket #76, Exhibit #10). On March 7, 1989, a Ford representative drafted a letter to Graham. That letter stated, in parts pertinent:

While we originally enjoyed a length discussion, I'm sure you will recall that I stressed two major concerns evidenced on the charts we provided you (copies attached for your reference).

1. A history of poor performance in Zanesville (sales in assigned market)—car and truck.

2. Potential impact of a single dealer on the market, controlling a large portion (71% of the truck market, 35% of the car market) which could have an adverse impact on the local competitive environment.

You submitted a brochure date February 27, 1989 addressing our concerns. Your response stated that your assigned market experienced pump-in sales due to the fact Muskinghum County is, in your opinion, a multi-dealer market area with shifting population and a "media hub" in Zanesville. . . .

After consideration of the above, I have determined that I cannot make a positive recommendation that the Ford Division approve you as the dealer in Mansfield. Therefore, for purposes of Section 4517.56 of the Ohio Revised Code, the Company objects to your application to be the replacement dealer in Mansfield, Ohio.

The specific objective criteria utilized in determining our position is your demonstrated incapacity to obtain a reasonable share of sales within your defined locality. Furthermore, we feel that it would be disadvantageous and injurious to the customers of the Mansfield market to allow such a non-competitive vehicle buying situation to be fostered by allowing one individual to control such a significant portion of the vehicle industry in a given location. Such a disadvantage to the customer would prove to be damaging to the manufacturer in terms of customer satisfaction and the sale of Ford Motor Company products.

I also feel obligated to raise another issue after my review of the buy-sell agreement. I feel I would be remiss if I didn't convey my grave concern for what would appear to be an inordinate amount of blue sky. As a matter of fact, were it possible for us to proceed with your appointment file, I assure you I would have put you on formal notice that to consummate this transaction with this amount of blue sky would, in my opinion, present a serious business risk.

(Docket #76, Exhibit #11) There is some dispute over whether this letter was ever sent.[2]

On March 17, 1989, the Defendant sent a letter to James Graham which stated that after review of additional information and despite some continued concerns, Ford was "prepared to proceed with a recommendation for a term Sales and Service Agreement as follows":

* The initial sales agreement will be issued for a two-year period.

---

**2.** Plaintiffs posit that Graham "received" this letter. (Docket #76 at 5) Defendant objects to this characterization:

Contrary to the statement in Call Ford's brief, Mr. Tillier's testimony was clear that although he prepared the draft of the letter, he never

sent it. (Tillier Depo. at 79). The copy attached to plaintiff's motion came from Ford's files.

(Defendant's Motion for Summary Judgment, Docket #106 at 5 note 3)

* The renewal of the agreement will be contingent upon the dealership achieving satisfactory sales and market share performance for both car and truck (at District average of above) and achievement of satisfactory levels of customer satisfaction, performance as measured by QC-P (at group average or above). The details of these conditions will be specified in a letter of understanding agreed to by you and the Ford Motor Company.

* With regard to our concern over the competitive market environment in the Mansfield area, we appreciate your stated willingness to offer the general manager a 25% interest in the proposed dealership. We believe this to be a step in the right direction; but, we would request that in addition to an initial 25% equity interest, you would afford him the opportunity to acquire a 51% interest within a reasonable period of time

(Docket # 76, Exhibit # 12) Graham was dissatisfied with this offer so he and plaintiffs appealed to Ford's Dealer Policy Board. The Board modified the length of the term and the conditions for renewal. (Defendant's Appendix, Exhibit # 8) Although the parties' briefs and evidence leave gaps from this point forward, they agree that Graham eventually accepted a franchise agreement differing from that enjoyed by plaintiffs. (See Docket # 76 at 5, "limited franchise to Mr. Graham"; Docket # 106 at 7, "Graham accepted the Sales and Service Agreement that Ford had offered in June 1989.")

Plaintiffs' eighth claim is based upon Section 4517.56(F) of the Ohio Revised Code. That section provides:

(F) No franchisor shall impose any conditions upon approval of a proposed transfer other than the transferee's compliance with the requirements of the franchise agreement between the franchisor and the transferor.

Ohio Rev.Code § 4517.56(F). Plaintiffs claim that Ford (the franchisor's) insistence that Graham (the transferee) comply with franchise terms materially different than those enjoyed under the agreement between Ford and plaintiffs (the transferor) constitutes a violation of this Ohio law. While this would, at the surface, certainly seem true, the defendant has raised three defenses to such a claim. We address these defenses *seriatim.*[3]

The defendant's first contention is that application of Section 4517.56(F) to the instant case would be retroactive and is therefore barred under Ohio law.[4] The statute at issue took effect in October 1987. (See Docket # 46 at Exhibit 4) Ford argues that applying the current statute to the Franchise Agreement between plaintiffs and Ford "would be retroactive and therefore inconsistent with § 1.48" of the Ohio Revised Code. (Defendant's Motion, Docket # 106 at 9) In so arguing, Ford relies upon a 1986 decision of Judge Aldrich, *Men–Guer Chrysler Plymouth, Inc. v. Chrysler Corp.,* No. C85–3368Y, slip op. (N.D.Ohio April 16, 1986) [hereinafter *"Men–Guer,* Docket # 46 Exhibit 6 at ——"]. The court believes it is appropriate to begin our discussion with the first case relied upon by the *Men–Guer* court.

In *Clifford Jacobs Motors, Inc. v. Chrysler Corp.,* 357 F.Supp. 564 (S.D.Ohio 1973) a dealership challenged the termination of its franchise under then-existing Ohio law. The dealer charged that the defendant, in 1972, failed to renew a 1970 contract, in violation of a law passed in 1971. *Id.* The intervening

---

**3.** In so doing, we must, of course, determine Ohio's law as stated (or would be found) by the Ohio Supreme Court and in light of the inherently persuasive precedent of Ohio appeals courts. *See New York Life Ins. Co. v. Wittman,* 813 F.Supp. 1287, 1295–96 (N.D.Ohio 1993) (Bell, J.). The court believes plaintiffs are mistaken in asserting that Michigan law is applicable to their Ohio law claim. (*See* Docket # 76 at 10).

**4.** As noted in Ohio Jurisprudence, "[t]he words 'retrospective' and 'retroactive' as applied to laws seem to be synonymous and, as such, they are often used interchangeably." 17 Oh.Jur.3d

§ 555 (1980). *See, e.g., Van Fossen v. Babcock & Wilcox Co.,* 36 Ohio St.3d 100, 104–109, 522 N.E.2d 489 (1988). Indeed, one court has stated as much. *See Fraternal Order of Police v. Youngstown,* 36 Ohio Misc. 103, 65 Ohio Op.2d 144, 303 N.E.2d 103 (1973) ("The words 'retrospective' and 'retroactive' … are synonymous."), *aff'd in part and rev'd in part on other grounds,* 49 Ohio App.2d 185, 360 N.E.2d 708 (1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). In light of this practice, the court shall consider and use these terms as equivalents.

Ohio law only permitted termination of the franchise for "just cause" or "with consent of the dealer" "*notwithstanding* provisions in an agreement which might allow the manufacturer to terminate the contract at will". 357 F.Supp. at 572 (emphasis in original). Judge Hogan, noting that in Ohio "every statute which takes away or impairs vested rights ... must be deemed retroactive" found the statute, as applied to pre-statute contracts, retroactive. 357 F.Supp. at 571–72. He then held that Section 1.48 of the Ohio Revised Code "compel[led] the prospective application" of the new Ohio Code, because of the "absence of any express provision [in the new statutes] indicating that the legislature intended these statutes to be retrospective." 357 F.Supp. at 572.[5] This opinion was strictly followed by Judge Kinneary in *Excello Wine Co. v. Monsieur Henri Wines, Ltd.*, 474 F.Supp. 203, 208 (S.D.Ohio 1979). These opinion were revisited in the 1981 case of *Coulter, Inc. v. Pontiac Motor Division, Gen'l Motors Corp.*, 4 Ohio App.3d 169, 4 OBR 269, 446 N.E.2d 1128 (1981). There, the Mahoning County Court of Appeals was asked, in 1981, to prevent the termination of a 1979 contract on the basis of the Dealer Act effective in 1980. Again, the court denied the dealer's request, finding the 1980 Act to be prospective only. In fairness it must be admitted that this court had some difficulty in determining the true foundation for the court's decision. *See* 4 Ohio App.3d at 171, 4 OBR at 272, 446 N.E.2d 1128. This leads us to Judge Aldrich's recent discussion of this issue.

In *Men–Guer*, the dealer entered into its franchise in 1964 and was threatened with its termination in 1985. The dealer brought suit to challenge the termination under the 1980 Ohio law. Judge Aldrich granted the defendant's motion to dismiss. Judge Aldrich first determined that since the statute was not expressly retroactive, it would be applied prospectively only. She then addressed the plaintiff's second argument:

> application of the statute to the facts *sub judice* ... would be prospective, because

the statute regulates the termination of franchising agreements, not their formation. Since the threatened termination of its franchise occurred well after the enactment of §§ 4517.54 and 4517.59, Men–Guer asserts that § 1.48 and the United States and Ohio Constitutions do not prevent the statute's application, despite having entered into the agreement before the statute was passed.

(*Men–Guer*, Docket # 46 Exhibit 6 at 4) Judge Aldrich rejected this argument:

> Men–Guer's argument is not well-taken. Ohio courts have clearly defined what constitutes retroactivity, adopting the celebrated definition of Justice Story:
>
>> Numerous cases hold that retroactive laws refer to those which create and define substantial rights, and which either give rise to or take away the right to sue or defend actions at law.... Upon principle, every statute which takes away or impairs vested rights, acquired under existing laws, or which creates a new obligation, imposes a new duty, or attaches a new disability in respect to past transactions or considerations must be deemed retrospective.
>
> *State ex rel. Michaels v. Morse*, 165 Ohio St. 599, 604 [138 N.E.2d 660] (1956). It cannot be doubted that §§ 4517.54 and 4517.59, which impose the obligation of good cause and good faith upon the termination terms of the contracts entered by Men–Guer and Chrysler many years earlier, would be retroactive if applied. *See Clifford Jacobs Motors*, 357 F.Supp. [at] 571 ...
>
> \. \. \. \. \.
>
> In view of the "weight of authority from other jurisdictions indicat[ing] a general unwillingness to impose the good cause requirement on existing franchise relationships", *Davis v. Gulf Oil Corp.*, 572 F.Supp. 1393, 1398 n. 10 (C.D.Cal.1983), this Court holds that the application of the statute to the existing contract between

---

5. Section 1.48 provides:
 A statute is presumed to be prospective in its operation unless expressly made retrospective.

Ohio Rev.Code § 1.48

Men–Guer and Chrysler would be retroactive and therefore inconsistent with § 1.48. (*Men–Guer*, Docket # 46 Exhibit 6 at 5).

On the basis of the foregoing caselaw, the instant defendant argues that § 4517.56(F) "cannot apply to the pre-existing contractual relationship between Ford and Call Ford." After careful consideration, the court wholeheartedly agrees.

 Following the decisions in the foregoing cases, the Ohio Supreme Court has clarified the approach Ohio courts should take in addressing the issue of retroactivity. *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 522 N.E.2d 489 (1988). The syllabus of the *Van Fossen* opinion provides the law governing our inquiry here [6]:

1. The issue of whether a statute may constitutionally be applied retrospectively does not arise unless there has been a prior determination that the General Assembly specified that the statute so apply. Upon its face, R.C. 1.48 establishes a threshold analysis which must be utilized prior to inquiry under Section 28, Article II of the Ohio Constitution.

· · · · ·

3. Analysis of whether a statute is unconstitutionally retroactive in violation of Section 28, Article II of the Ohio Constitution requires an initial determination of whether that statute is substantive or merely remedial. While in some cases the line between substantive and remedial may be difficult to ascertain, these terms, as applied, provide readily distinguishable contours.

*Van Fossen*, 36 Ohio St.3d at 100, 522 N.E.2d 489. Thus, our first step should be to determine whether § 4517.56(F) is "expressly made retroactive". Ohio Rev.Code § 1.48. Both the parties, apparently, and this court certainly, have found no language in that section indicating a legislative intent to apply the law retroactively. *Cf.* Ohio Rev.Code § 4517.59. Thus, Section 4517.56(F) is prospective only. In the post *Van Fossen* era, this is where our retroactivity inquiry ends.

See, e.g., *Earl Evans Chevrolet v. Gen'l Motors Corp.*, 74 Ohio App.3d 266, 272, 598 N.E.2d 1187 (1991), *motion overruled*, 62 Ohio St.3d 1455, 579 N.E.2d 1394 (1991). We must, therefore, apply this law to the case at bar.

In October of 1980, Ford and plaintiffs executed the Franchise Agreement. In 1987, the legislature enacted § 4517.56(F). In 1989, plaintiffs and Graham executed the Sales Agreement. After that time, it is alleged, Ford imposed conditions on its approval of the transfer other than Graham's compliance with the terms of the Call Ford/Ford Franchise Agreement. Section 4517.-56(F) is, as noted above, prospective only. Therefore, it can only apply to transactions which occurred after its effective date. Plaintiff argues that inasmuch as Ford's violation of the statute transpired after 1987, there is no doubt that application of the statute to the second franchise agreement between Ford and Graham is prospective. While such an argument has superficial appeal, the court cannot accept it as a basis for determining the motion under discussion.

The unstated proposition woven into the cloth of Ohio caselaw on this topic is this: a prospective law may only be applied in a manner which does not make it retrospective. Retrospectivity is concerned not only with the date of enactment vis-a-vis the event sued upon, but also with the effect of the statute on preexisting rights. Ohio, and for that matter common legal usage, define retroactive legislation as that which "create[s] and define[s] substantial rights" and "takes away or impairs vested rights, acquired under existing laws, or which creates a new obligation, imposes a new duty, or attaches a new disability in respect to past transactions or considerations...." *State ex rel. Michaels v. Morse*, 165 Ohio St. 599, 604, 138 N.E.2d 660 (1956). *See also* definitions of retroactive and retrospective laws in *Black's Law Dictionary* 1184 (1979 ed.). Thus, when Judge Aldrich stated that "application of the statute to the existing contract between Men–Guer and Chrysler would be retroactive

---

6. In Ohio, courts must follow the principles set forth in the syllabi of Ohio Supreme Court opinions; the syllabi, not the body of the opinion

states the law of the case. *Smith v. Klem*, 6 Ohio St.3d 16, 450 N.E.2d 1171 (1983).

and therefore inconsistent with § 1.48", she meant, it is believed, this:

1) Section 1.48 of the Ohio Revised Code dictates that the substantive statute be prospective only.

2) Despite the fact that the event sued upon occurred after the passage of the substantive statute, if that statute were applied to this suit, it would impair vested rights and would result in retrospectivity.

3) Therefore the statute, which is prospective only, may not be applied to this transaction.

The courts of other states have, in some instances, developed more fully a means of explaining this principle than have the courts of Ohio. *See, e.g., Weisberg v. Royal Ins. Co. of America,* 124 Ill.App.3d 864, 871, 80 Ill. Dec. 187, 191, 464 N.E.2d 1170, 1174 (1984) ("[R]etroactivity is defined in terms of the effect a law would have on vested contractual rights, not in terms of the time when a party happens to assert those rights."); *Neel v. First Federal Savings and Loan Assoc. of*

*Great Falls,* 207 Mont. 376, 383–84, 675 P.2d 96, 100 (1984) ("If the application sought would be retroactive in effect, then to validate such an application, a legislative intent for it to operate in such a manner must exist."). *See also Winstead v. Ed's Live Catfish & Seafood, Inc.,* 554 So.2d 1237, 1241 (La.App.1989) ("a law will not be applied retroactively if doing so would unconstitutionally disturb vested rights"), *cert. denied,* 558 So.2d 570 (1990).

With this established, we turn to the facts of this case. As noted above, the Franchise Agreement between plaintiffs and defendant stated that Ford "expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities *specifically selected and approved by the Company.*" (Defendant's Appendix, Exhibit 1, Preamble ¶ F at iii) (emphasis added). Indeed, the very theme of the Franchise Agreement is that Ford may pick and choose future franchisees on its own terms.[7] With this established, it is in-

---

7. Plaintiff admits to the plain meaning of the preceding sentence, but argues that two other portions of the contract render it ambiguous on the issue of the availability of transfer under the Franchise Agreement—therefore asserting that it should be construed to permit unrestricted transfer. The court disagrees.

In addition to the "no transfer" language cited above, plaintiff directs the court to two other portions of the Agreement. The first is found in the final three sentences of ¶ F of the Agreement's preamble, which is quoted in full on pages seven and eight of this opinion. After stating that transfer is not possible and limiting the contract's application to the Dealer and management as defined in the Agreement, paragraph F concludes:

> The Dealer shall give the Company prior notice of any proposed change *in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or any right or interest herein,* shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and the Dealer. The Company shall not unreasonably withhold its consent to **such change.**

(Plaintiff's Opposition, Docket # 76, Exhibit 6 at iv ¶ F) (emphasis added) The other portion of the Agreement which, plaintiff alleges, purports to give authority for assignment is ¶ 17(b)(1). That paragraph, addressing dealer-controlled

events warranting termination of the Agreement, states:

> Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this agreement; **or** transfer by operation of law or otherwise, of the principal assets of the Dealer that are required for the conduct of DEALERSHIP OPERATIONS; **or** any change, however accomplished, without the Company's prior written consent, which consent shall not be unreasonably withheld, in the direct or indirect ownership or operation management of the Dealer as set forth in paragraph F.

(*Id.* at 15 ¶ 17(b)(1)) (emphasis added).

Under Michigan law, if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous. *Raska v. Farm Bureau Mutual Ins. Co. of Michigan,* 412 Mich. 355, 314 N.W.2d 440 (1982). That is the case here. Paragraph 17(b)(1) simply provides *no* support for the availability of transfer—it provides that transfer gives grounds for termination of the agreement. (*See* Court's Order addressing Count One) The consent language of ¶ 17(b)(1) simply modifies a change in ownership or management of the Dealer *"as set forth in paragraph F."* Paragraph F emphatically states, as a preface, that no transfer is possible. While its second to last sentence does speak of assignment, such assignment would be ineffective without the company's consent. Consent may only be reasonably withheld as to change in the ownership or management authority of the dealer. (*See* ¶ F speaking of

disputable that the statute at issue deprives Ford of its contractual rights.

Section 4517.56(F) states:

No franchisor shall impose any conditions upon approval of a proposed transfer other than the transferee's compliance with the requirements of the franchise agreement between the franchisor and the transferor.

Ohio Rev.Code § 4517.56(F). In other words, the statute mandates that Ford accept any future franchisee on the same terms it had with the prior franchisee. Clearly, application of this "impairs vested rights ... [and] imposes a new duty, or attaches a new disability in respect to past transactions or considerations...." *State ex rel. Michaels v. Morse,* 165 Ohio St. at 604, 138 N.E.2d 660. The 1980 Franchise Agreement, by its terms, was "personal"—its terms reflected the strengths and weaknesses of both parties to the transaction. (Defendant's Appendix, Exhibit 1, Preamble ¶ F at iii) Ford's entrance into the contract with plaintiffs specifically contemplated its ability to renegotiate a separate agreement with any future transferee, or at the very least to withhold its consent to an assignment. Application of the 1987 statute would destroy these rights and would impose upon Ford the duty to assume obligations with a stranger to its original contract on the same terms as the original

contract. Section 4517.56(F), as interpreted by plaintiff, would impose plaintiffs' 1980 Franchise Agreement upon Ford and future franchisees in perpetuity—destroying Ford's vested contractual right to choose its partners on its own terms. Such an application is retrospective and may not be pursued.[8] Section 4517.56(F) may not and cannot be applied to this transaction.

In light of the foregoing conclusions, the court believes it would be rather pointless to examine in detail Ford's alternative theories relating to notice and the statute of limitations; although the court believes they are not without merit. *See Holt Motors, Inc. v. Gen'l Motors Corp.,* 1987 WL 272249, 1987 U.S.Dist.LEXIS 16088 (S.D.Ohio June 25, 1987) (Rice, J.,) (emphasis added) ("the franchisee *must* provide the franchisor with: (1) written notice of the name and address of the prospective transferee; (2) the names and addresses of the transferee's prospective management personnel; and (3) when a reasonable request by the franchisor has been made, the franchisee and the prospective transferee must supply the franchisor with information regarding the transferee's character, business experience, and financial ability."), *aff'd* 860 F.2d 1079 (6th Cir. Oct. 19, 1988) (table) ("§ 4517.56 imposes an obligation upon the franchisee and the prospective transferee to provide certain written in-

---

"such change"; ¶ 17(b)(1) reasonable consent to change in ownership as set forth in ¶ F). This is the contract's unambiguous construction, a construction no doubt strengthened by the fact that plaintiff bases his claim for breach of contract (i.e. the unreasonable withholding of consent to transfer) solely upon ¶ 17(b)(1) of the Franchise Agreement. (*See* Plaintiff's Opposition to the Defendant's Motion for Summary Judgment on Count One, Docket # 74 at 3, 7; Defendant's Motion for Summary Judgment on Count One, Docket # 46 at 8–9).

Therefore, the portions of the contract, cited by the plaintiff, at best, (i.e. construed against Ford), reserve to Ford the right to negotiate its own contract with successors and only provide for assignment with Ford's consent. It in no way grants plaintiff an unrestricted right to assign the contract. (*See* Order Addressing Count One at 7 footnote 1) Further, there is no genuine issue that the franchise was terminated, and not transferred as alleged by Plaintiff. (*See* Order Addressing Count Six at 11–15).

**8.** Indeed, the court surmises that plaintiff's approach, if it were permitted, would necessarily

impair the contract in a manner violative of Section 28, Article 2 of the Ohio Constitution. *See, e.g., Kiser v. Coleman,* 28 Ohio St.3d 259, 503 N.E.2d 753 (1986); *Burtner–Morgan–Stephens Co. v. Wilson,* 63 Ohio St.3d 257, 586 N.E.2d 1062 (1992). *Geary Distributing Co., Inc. v. All Brands Importers, Inc.,* 931 F.2d 1431 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992) (particularly relevant case applying Florida's contract clause, which is apparently indistinguishable from Ohio's). *See also Globe Liquor Co. v. Four Roses Distillers Co.,* 281 A.2d 19, 20–21 (Del. Supr.1971), *cert. denied,* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971) ("The effect of the Delaware Franchise Security Law is to transform the contract ... from one providing for a period of one year with no right of renewal ... to a contract to extend into the indefinite future which the [franchisor] may terminate only upon certain conditions and at its peril.... It is therefore not a minor change or infringement permissible under the exercise of the police power. It is therefore proscribed by the Contract Clause....").

formation to the franchisor.... The district court correctly concluded that ... no genuine issue of material fact existed regarding Logan's and O'Rourke's failure to comply...."). *See also* a recent opinion by an Ohio appeals court on the statute of limitations issue:

> If the primary purpose for R.C. 4905.61 is to provide punishment, the one year statute of limitations found in R.C. 2305.11 applies. However, if the purpose of R.C. 4905.61 is simply to compensate individuals who were wrongfully charged for utilities, a six year statute of limitations listed in R.C. 2305.07 applies. The trial court determined that the primary purpose of R.C. 4905.61 is to provide punishment. Accordingly, the trial court determined that the one year statute of limitations found in R.C. 2305.11 applied in this case and that appellants had failed to timely file their complaint. Appellants argue that ruling was in error and urge this court issue an opposite ruling.
>
> Appellants argue that the provisions of R.C. 4905.61 were written only to provide for private damages in the event a utility violated R.C. 4905.99(C), which establishes penalties which may be pursued by the State when a utility violates R.C. 4905.32. Appellants argue that the existence of the separate statute imposing penalties which may be sought by the State is evidence that the first statute, which enable private individuals to seek damages, was not drafted to establish any punishment to a utility which fails to conform with the requirements of R.C. 4905.32. Appellee disagrees, arguing that the existence of treble damages in the statute which creates a private remedy, demonstrates that the purpose of the statute was to punish the utility which violated R.C. 4905.32. Appellee cites to decisions from this court in which we construed treble damages provisions of the Consumer Sales Practices Act as being designed to provide compensatory and punitive damages. Appellee cites several other cases decided by various Ohio court in which the courts states that treble damages are punitive. *See, e.g., Hardman [Hardeman] v. Wheels, Inc.* (1988), 56 Ohio App.3d 142 [565 N.E.2d 849], certiorari denied (1989), 493 U.S. 848 [110 S.Ct. 144, 107 L.Ed.2d 102]; *Milhailoff [Mihailoff] v. Ionna* (May 6, 1987), Hamilton App. No. C–860040, unreported [1987 WL 10889]. Appellee argues that the trial court was correct as a matter of law when it ruled that R.C. 4905.61 was designed by the legislature to inflict a penalty. After careful review of the arguments, this court concludes that the trial court did not err when it ruled that R.C. 4905.61 was designed to inflict a penalty, thereby triggering the one year statute of limitations listed in R.C. 2305.11.

*Usternal v. Gem Boat Service, Inc.,* 1992 Ohio App.LEXIS 5881, 1992 WL 337600 at *3 (Ohio App. Nov. 20, 1992), *motion overruled,* 66 Ohio St.3d 1460, 610 N.E.2d 423 (1993). The court submits that these decisions seriously undermine the legal efficacy of plaintiffs' eighth count.

### IV. Conclusion

As the foregoing analysis indicates, no issues of material fact preclude judgment as a matter of law. Accordingly, the plaintiffs' motion for partial summary judgment, Docket # 42, is **DENIED**. The defendant's motion for summary judgment as to count eight, Docket # 106, is **GRANTED**. Judgment is granted in favor of defendant on count eight of the plaintiffs' complaint.

IT IS SO ORDERED.