**BILL CALL FORD, INC.,
et al., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

No. 5:91 CV 242.

United States District Court,
N.D. Ohio, E.D.

Aug. 18, 1993.

Timothy A. Shimko, Sr., Shimko & Associates, Cleveland, OH, Edward C. Baran, Jr., Baran, Piper, Tarkowsky & Fitzgerald, Mansfield, OH, John P. Calandra, Jr., Baran, Piper, Tarkowsky & Fitzgerald, Thomas G. Lobe, John F. King, Hofelich & King, Cleveland, OH, for plaintiffs.

James B. Niehaus, Daniel W. Hammer, Sr., Michael E. Smith, Thompson, Hine & Flory, Cleveland, OH, for defendant.

## ORDER ADDRESSING COUNTS ONE, TWO, THREE, FOUR, FIVE, AND SEVEN

SAM H. BELL, District Judge.

### PREFACE

*The parties have moved for summary judgment on all counts of the complaint. The court has addressed each motion by separate opinion. They are, in essence, a trilogy. Because some orders, for the sake of efficiency, reference others made in this matter, the court suggests that a reader peruse them in the order they were prepared. The order of drafting is this: (1) opinion addressing count eight, 830 F.Supp. 1034, (2) opinion addressing count six, 830 F.Supp. 1045, (3) opinion* addressing counts one, two, three, four, five and seven, 830 F.Supp. 1053.

### I. Introduction

Currently before the court is defendant's motion for summary judgment on counts one, two, three, four, five, and seven of plaintiffs' complaint, Docket # 44. Plaintiffs have responded to this motion, to which the defendant has replied. These documents are the subject of the following opinion. We begin with a brief summary of the relevant allegations contained in plaintiffs' complaint.

In their amended complaint, the plaintiffs allege that they were franchised by defendant Ford commencing in 1980 and operated as such at a location in Mansfield, Ohio until mid–1990. (Amended Complaint at ¶ 4) In February of 1989, the plaintiffs purportedly entered into a contract with James Graham, already a Ford dealer in Zanesville, Ohio, for the sale of its franchise to Graham. (*Id.* at ¶ 5) Plaintiffs allege that they provided Ford with all necessary documentation and requested that defendant approve James Graham as a prospective purchaser. Plaintiffs, in count one, claim that Ford, by failing to approve Graham as the successor franchisee, breached a sales and service agreement entered into by the parties, damaging plaintiffs in the sum of two million dollars. For this same act, plaintiffs in count two allege that the defendant "breached the requirements of good faith and fair dealing in performance of its duties with Plaintiff, its franchisee, as required by the laws of the State of Michigan and the laws of the State of Ohio." (Amended Complaint at ¶ 11) In count three, plaintiffs claim that Ford "tortiously, maliciously and intentionally interfered with the contractual arrangements between Plaintiff and Graham." (*Id.* at ¶ 13) In their fourth count, plaintiff alleges that the defendant's actions were "wilful, wanton and malicious and are such that they to as (sic) entitle the Plaintiff to treble damages." (*Id.* at ¶ 15) In count five, plaintiffs aver that the "acts and omissions of the Defendant, in tort and in breach of contract and violation of statutes is such as to entitle the Plaintiff double damages, treble damages, punitive damages and/or attorneys fees in a sum to be

determined at trial." (*Id.* at ¶ 17) In count seven, plaintiffs contend that Ford's failure to timely approve the sale of the franchise to Graham violated Section 4517.56 of the Ohio Revised Code and other provisions of Chapter 4517 of the Code. (*Id.* at ¶ 22)

## II. Standard of Review

The court has previously addressed the summary judgment standards applicable to the instant matter. (*See* Order Addressing Count Eight). To avoid needless repetition, those standards have been omitted in this opinion although they are, of course, a pertinent guide for review of the instant motion. If particularly germane, the court shall revisit the dictates of Rule 56 in the legal analysis which follows.

## III. Law and Analysis

### A. Count One

As noted above, plaintiffs' first count alleges that Ford "breached its agreement with Plaintiff by failing to approve Graham as the successor franchisee in a timely manner to the damage of Plaintiff in the sum of Two Million Dollars". (Amended Complaint ¶ 9) Plaintiffs ground this claim on paragraph 17(b)(1) of the Franchise Agreement between the plaintiffs and the defendant. (*See* Defendant's Motion, Docket # 46 at 8–9 and Appendix Exhibit 12; Plaintiffs'

Opposition to the Defendant's Motion, Docket # 74 at 3, 7) Plaintiffs argue:

> The Sales and Service Agreement specifically states at 17(b)(1) "any transfer or attempted transfer by the Dealer ... which consent [by Ford] shall not be unreasonably withheld." (Ex. 6, p. 15, para. 17(b)(1)) This contract's express language states that Ford cannot unreasonably withhold consent.

(Plaintiffs' Opposition, Docket # 74 at 7) The court disagrees with plaintiffs' construction of the contract at issue. In point of fact, the court believes the language regarding "consent", does not even modify the term "transfer or attempted transfer", which plaintiffs suggest occurred in the case at bar. In other words, even if this court assumed as fact that there was a "transfer or attempted transfer" of the Franchise Agreement, paragraph 17(b)(1) simply does not state that the company cannot unreasonably withhold its consent to such a transfer.[1]

Paragraph 17(b)(1) of the Franchise Agreement provides, in pertinent part, the following:

## TERMINATION OR NONRENEWAL OF AGREEMENT

First, the intent of paragraph F is clear—the agreement was personal between the parties. Second, the Company may not unreasonably withhold its consent to "such change". A plain reading of foregoing quote indicates that the "change" must be in the ownership or managerial authority of the Dealer. The term "such change" is twice used in the foregoing clause. The term "such" is "used to avoid repetition of descriptive term" Webster's Third New Int'l Dictionary (unabridged) 2283 (1986) Thus, "such change" must be the "change" previously described, to wit: change in the ownership or management. Third and finally, this construction is harmonious with a plain reading of ¶ 17(b)(1) which, as noted *infra*, only prohibits unreasonable consent to change in the ownership or management "as set forth in paragraph F" (Franchise Agreement at 15 ¶ 17(b)(1)). Thus, at best, the contract's preamble only permits assignment with Ford's consent—a consent which is solely reserved to Ford's discretion, and which could not support a breach of contract claim.

---

1. The Court must note that plaintiffs rely upon no other portion of the Franchise Agreement for their breach of contract claim. Nevertheless, the court must note that it has considered and rejected another clause cited in plaintiffs' briefs. As indicated in the Order Addressing Count Eight, the Agreement's preamble, after explicitly stating that the contract was personal, not assignable, and is valid as between Ford and signatory dealer only, concludes with the following paragraph:

   > The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of such person. No such change or notice, and no assignment of this agreement or any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and the Dealer. The Company shall not unreasonably withhold its consent to such change.

   (Franchise Agreement, at iv ¶ F) The court does not believe this paragraph gives foundation for plaintiffs' claim for several reasons.

17.(b) *By Company Due to Events Controlled by Dealer.* The following represent events which are substantially within the control of the Dealer and over which the Company has no control, and which are so contrary to the intent and purpose of this agreement as to warrant its termination or nonrenewal:

(1) Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this agreement; **or** transfer by operation of law or otherwise, of the principal assets of the Dealer that are required for the conduct of DEALERSHIP OPERATIONS; **or** any change, however accomplished, without the Company's prior written consent, which consent shall not be unreasonably withheld, in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F.

(Defendant's Appendix, Exhibit 1 at 15 ¶ 17(b)(1)) (non-titular bold type added for emphasis). The significance of the semi-colons and conjunctions separating the three phrases contained in subparagraph (1) should not and cannot be ignored. The very definition of semi-colon is:

a punctuation mark; that is usu. used to separate the *independent clauses of a compound sentence* when the clauses are joined by no connective, when the clauses are joined by a conjunctive adverb, or when the clauses are joined by a coordinating conjunction but are long and contain internal punctuation and that is often used to separate long items in a series.

Webster's Third New Int'l Dictionary (unabridged) 2063 (1986). The court firmly believes and here holds that the use of the semi-colon in combination with the disjunctive conjunction "or" separates the three clauses in subparagraph (1) and renders them independent of one another.[2] Thus, the admonition that "consent shall not be unreasonably withheld" only applies when there is "any change, however accomplished, without the Company's prior written consent . . . in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F." Consequently, the first clause in subparagraph (1), relating to "transfer or attempted transfer" is simply not subject to consent, reasonable or otherwise—such an action on the dealer's part simply warrants termination or non-renewal of the Franchise Agreement. Plaintiffs may not, therefore, claim that the defendant unreasonably withheld its consent to a purported transfer. Count one is, in other words, without contractual predicate and summary judgment on that count is appropriate and shall be granted.[3]

## B. Count Two

As noted above, in count two plaintiff alleges that Ford breached the requirements of good faith and fair dealing in performance of its duties with plaintiffs, as required by

---

**2.** The court notes that this is not a preferred method of writing disjunctively. If a writer uses a conjunction such as "or", only a comma need be inserted. If the writer wishes to dispense with the conjunction, a semi-colon is inserted between the independent phrases. *See* W. Strunk & E.B. White, *Elements of Style* 5–6 (3d. ed. 1979). Despite some problems with style, however, the court believes it cannot ignore the obvious intent of the use of both the disjunctive conjunction "or" and the use of a semi-colon. They are a veritable declaration of independent clauses.

**3.** Even if plaintiffs were to claim, contrary to their discovery and motion position, that they base their claim upon the third clause of subparagraph (b)(1), it seems clear that summary judgment on such a claim would necessarily be compelled. The third clause only applies to "any change . . . in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F.". Paragraph F states that the principal owner of the "Dealer" (defined at page i of the Agreement as "Bill Call Ford, Inc.") is William J. Call and that full managerial authority for the operation of the dealership would be held by him. In December 1983, the name of the dealership was changed to Mid–Ohio Ford, Inc., with prior approval of Ford. (Call Affidavit, Docket # 65 Exhibit A at ¶ 4) Mid–Ohio Ford's sole shareholder is Call Investments, whose sole shareholder is William Call. (Call Depo. at 10–11) Thus, there has been no change in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F of the Franchise Agreement. The transaction between plaintiffs and Graham was not a stock transaction but was, on its face, a simple asset purchase. (*See* Plaintiff's Opposition, Docket # 74, Exhibit 6). In other words, the third clause of subparagraph (1) is simply not applicable to the transaction plaintiffs characterize as a "transfer".

the laws of Michigan and Ohio by failing to grant its timely consent to the transfer of the franchise from plaintiffs to Graham. (*See* Amended Complaint at ¶ 11) The defendant challenges this claim. In their brief, plaintiffs acknowledge that Ford's motion asserts that "[p]laintiffs have not obtained or produced any evidence to support the claims in counts one, two, three, four, five and seven," a perfectly acceptable contention when the moving party does not, as is the case here, bear the burden of proof.[4] (Plaintiffs' Opposition, Docket # 74 at 5). The court shall begin by determining the law applicable to this case, and then apply that law to the proof at hand.

■ At the outset, the court notes that Michigan law is inapplicable to the instant suit. *See* Mich. Comp. Laws § 445.1582 (providing that the Michigan dealer's statute "shall have no application to dealers outside the State of Michigan.") Thus, we are limited to Ohio law. Although plaintiffs have nowhere articulated the foundation for this claim, the court presumes our starting place is § 4517.59 of the Ohio Revised Code. That section provides:

> Notwithstanding the terms, provisions, or conditions of any agreement, franchise, or waiver, no franchisor shall:
>
> (A) In acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or

failing to renew a franchise, fail to act in good faith.

Ohio Rev.Code § 4517.59(A). This statute has held substantially the same form since 1980. (*See* Defendant's Revised Motion for Partial Summary Judgment as to Count Six, Docket # 46, Exhibit # 4) A plaintiff/dealer bears the burden of proving bad faith. *Earl Evans Chevrolet v. Gen'l Motors Corp.*, 74 Ohio App.3d 266, 277, 598 N.E.2d 1187 (Lake Cty.App.1991), *motion overruled*, 62 Ohio St.3d 1455, 579 N.E.2d 1394 (1991) ("appellees [the dealer] produced more than a mere 'scintilla' of evidence upon which reasonable minds could differ....")[5]

■ Good faith is currently, under 1987 amendments to the Code, defined as follows:

> "Good faith" means honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade as is defined in division (S) of section 1301.01 of the Revised Code, including but not limited to the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation; provided, however, that recommendation, endorsement, exposition, persuasion, urging, or argument shall not be considered to constitute a lack of good faith.

Ohio Rev.Code § 4517.01(BB) (1987).[6] This law guides our inquiry.

---

4. *See infra* footnote 5.

5. The parties have devoted many pages of brief to the issue of who bears the burden of proof on the alleged violations of the Ohio Revised Code. That issue arises due to Ford's anticipation of such an argument by Call Ford based upon the language of § 4517.65(D) of the Ohio Revised Code. That section provides:

> The burden of proof *to establish the franchisor's good cause* shall be on the franchisor in protests and actions instituted under this section and sections 4517.50, 4517.54, and 4517.56 of the Revised Code.

Ohio Rev.Code § 4517.65(D) (emphasis added). This section is irrelevant to plaintiffs' second cause of action. The issue here is "good faith", not "good cause" and the only place the burden is shifted to the franchisor is in relation to actions necessitating proof of "good cause" brought pursuant to the substantive provisions of §§ 4517.65(B), 4517.50, 4517.54, and 4517.56— none of which are implicated in plaintiffs' second

count. The burden of proof, as indicated in *Earl Evans*, remains on the plaintiffs to prove their case.

6. Ford argues that the court should apply the definition of "good faith" in effect at the time the parties entered into the Franchise Agreement. The court believes Ford is mistaken. The Lake County Court of Appeals has held (well before the instant motion) that the 1987 definition applicable via § 4517.59(A) "applies prospectively to all existing franchises". *Earl Evans Chevrolet v. Gen'l Motors Corp.*, 74 Ohio App.3d 266, 272, 598 N.E.2d 1187 (1991). As this court has previously noted, when:

> we are the beneficiaries of an opinion by an Ohio appellate court ... [we] are obligated to follow its precedent absent persuasive countervailing arguments which convince this court that the state's highest court would rule to the contrary.

*New York Life Ins. Co. v. Wittman*, 813 F.Supp. 1287, 1295 (N.D. Ohio 1993) (findings of fact

Section 1301.01(S) of the Revised Code (UCC 1–201), until recently, has received surprisingly little Ohio caselaw interpretation. Nevertheless, the Ohio Code and pertinent Ohio cases are sufficient for present purposes. That section states, in pertinent part, that "'[g]ood [f]aith' means honesty in fact in the conduct or transaction concerned." Ohio Rev.Code § 1301.01(S). Thus, Ford was duty bound to be honest in fact, and observe reasonable commercial standards in a manner so as to guarantee freedom from coercion, intimidation or the threat thereof. Ohio Rev.Code §§ 4517.59(A), 4517.01(BB), 1301.01(S). The term coercion, as used herein, means "to compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences." Ohio Rev.Code § 4517.01(CC). It "does not mean to argue, urge, recommend, or persuade." *Id.* With this established, we turn to the case at bar.

The fundamental premise of plaintiffs' claim in count two is that Ford failed to "grant its timely consent to the transfer of the Ford Franchise from Plaintiff to Graham." (Amended Complaint at ¶ 11) Ford disputes the truth of this premise. The evidence clearly establishes that there was a significant period of time between the execution of the Buy/Sell Agreement and Mr. Graham's assumption of franchisee status in Mansfield. Plaintiff and Graham entered into a Buy/Sell Agreement on February 3, 1989. (Plaintiffs' Opposition, Docket # 74, Exhibit # 5) On February 14, 1989, Plaintiff Call received the following letter from Ford:

We are in receipt of your buy/sell with Mr. James F. Graham dated February 3, 1989 and received on February 9, 1989.

It is unlikely that we will be able to approve Mr. Graham's application as the replacement dealer in Mansfield, Ohio prior to March 8, 1989, because we do not have all the information necessary to evaluate the application. Despite increased activity in the Market Representation Department we will endeavor to obtain the necessary information as quickly as possible. Therefore, for the purpose of Section 4517.56 of the Ohio Revised Code, the Company objects to Mr. Graham's application to be the replacement dealer in Mansfield, Ohio. However, upon receipt of all requested information, we will complete our review and inform you of the status of the application.

(*Id.* at Exhibit # 10) Plaintiffs aver, and defendant denies, that Mr. Graham received a similar letter from Ford.[7] On March 17, 1989, Ford sent a letter to James Graham

---

and conclusions of law). Inasmuch as the Ohio appeals court based its conclusion on the retroactive language contained in § 4517.59, the court believes that any argument that the judges were incorrect, even if one had been presented, would be quite unpersuasive. Nevertheless, the *Earl Evans* opinion teaches that the definitional change engendered by the '87 amendment, while superficially dramatic, was not so in fact. The 1980 version of the Code defined "good faith" as: the duty of any party to any franchise, and all officers, employees, or agents thereof, to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party; provided, however, that recommendation, endorsement, exposition, persuasion, urging, or argument shall not constitute a lack of good faith. Ohio Rev.Code § 4517.01(BB) (1980). In *Earl Evans*, the trial court erred by giving the '87 definition to the jury. On appeal, General Motors argued that under the '80 definition, one could only breach the duty of good faith by coercion and/or intimidation, and that the '87 amendment lowered this standard to its prejudice. While the appeals court agreed that coercion was a necessary element under the 1980 definition, the court disagreed with GM's argued result. The court noted that, unlike the federal law, Ohio's 1980 law provided a broad definition of coercion, to wit: "the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of the franchise or agreement" Ohio Rev.Code § 4517.01(CC) (1980) Thus, the appeals court concluded that "there is no substantive difference between the appropriate definition of 'good faith' which was in effect at the time of the alleged conduct and the 1987 amendment's definition of 'good faith' which was erroneously given to the jury." *Earl Evans*, 74 Ohio App.3d at 274, 598 N.E.2d 1187. The *Earl Evans* opinion teaches us another lesson about the Ohio law, to wit: while the Ohio act and the federal act are analogous, they are clearly not identical in form or substance. This court will therefore follow Ohio law relating to good faith.

7. Although the court accepts the mailing of this letter as a disputed issue of fact, the undersigned must note that Ford's position, in light of conditional approval it granted only a week or so later, is logically probable.

provisionally approving his assumption of franchisee status in Mansfield subject to various conditions. It suffices to say that after various appeals and disputes, Graham, over a year later, entered into a franchise agreement with Ford which differed from that enjoyed by Bill Call Ford. There was a significant delay.

The court must note, however, that no "transfer" (whatever that means) of the franchise occurred. The record evidence in this matter overwhelmingly indicates that Mid-Ohio resigned its franchisee status and Graham Ford applied to become and became a distinct franchisee—matters varying significantly from mere assignment of Call Ford's rights under its Franchise Agreement with Ford. (*See* Court's Order disposing of count eight). Thus, what plaintiffs really argue is that Ford breached its duty of good faith by unreasonably delaying the award of franchise status to Graham once the Buy/Sell Agreement between Call Ford and Graham was signed. It is indisputable that the "delay" of which plaintiffs complain was caused by Ford's imposition of various conditions on the franchise it awarded to Graham which varied from the terms of Franchise Agreement between Ford and Bill Call Ford. Indeed, it seems clear that this is where plaintiffs' claim lies.

In their brief, the plaintiffs claim that the defendant's acts were coercive and intimidating and breached the duty of good faith by "imposition of condition after condition on the Call/Graham transfer," and by "purposefully, maliciously and wantonly withh[olding] its approval for fourteen months." (Plaintiffs' Opposition, Docket # 74 at 14, 16) Plaintiffs' brief on these issues is divided into three segments which the court shall discuss *seriatim.* Although not articulated, these three segments apparently are divided into motive or goal, conduct to achieve that goal, and the result of that conduct.

■ As for the first proposition, relating to motive or goal, plaintiffs' thesis fails, it is believed, for lack of proof. Plaintiffs' brief on coercion, while quite persuasively written, simply finds no support in the record. Plaintiffs cite this court to a 10th Circuit case dealing with the federal Automobile Dealer's Day in Court Act [8], and assert that:

in the instant case Ford had a favored person, Ford really wanted to put a minority dealer into William Call's dealership (Ex. 4, p. 13, lines 5–19, p. 20, lines 20–25, p. 21, lines 1–3). Ford exerted such coercion and intimidation on the Willliam (sic) Call and Mr. Graham (sic), trying to convince Mr. Graham to back out. Defendant did this through its constant demands on Mr. Graham. Defendant ensured that William Call would be so desperate to sell, that in order to cut his losses, he would sell to anyone at any price. Ford was trying to meet its minority candidate commitment (Ex. 4, p. 13, lines 5–19, p. 20, lines 20–25, p. 21, lines 1–3). While this still may be an admirable goal on Ford's part, this is still America, where free enterprise is encouraged and the Plaintiffs are allowed to sell the franchise for what it's worth, based on William Call's ten years of hard work, and the good will he had established in building up the franchise.

(Plaintiffs' Opposition, Docket # 74 at 10–11) The court agrees with Ford's characterization of this reasoning and proof:

the only evidence is that Ford had announced a goal of establishing more minority dealerships, that the Cleveland District had not met its minority dealership goal and that Ford had discussed with Call Ford the possible sale of its assets to a Dealer Development Corporation that would serve as a vehicle for establishing a minority dealer. Call Ford would then have this Court infer that because Call Ford did not sell to a Dealer Development corporation, Ford sought to "punish" Call Ford by delaying Graham's approval. The inference Call Ford asks this Court to make is not supported by the record. Nevertheless, even if Ford had told Call Ford that it would not approve the application of any dealer in Mansfield other than a minority, Ford's conduct would not be "a

8. *Colonial Ford, Inc. v. Ford Motor Co.,* 592 F.2d 1126 (10th Cir.1979), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

failure to exercise good faith" nor would it be "coercive".

(Defendant's Reply Brief, Docket # 73 at 7). There is no proof to justify the inference that Ford withheld its consent to Graham's application because Ford wanted Call Ford to sell to a minority dealer.

■ The second portion of plaintiffs' brief deals with the conduct engaged in by Ford, the true focus of inquiry for the claimed breach of the duty of good faith. Plaintiffs claim that Ford unreasonably delayed Graham's assumption of a franchise by imposing "condition after condition on the Call Graham transfer" (Plaintiff's Opposition, Docket # 74 at 14) Plaintiff argues:

> Ford put pressure on Graham to accept their demands or they would not approve the transfer of the franchise. This put pressure on William Call to lower his price to Graham because the numerous demands by Ford made the franchise less valuable. Additionally, Plaintiffs suffered losses of approximately Fifty Thousand Dollars ($ 50,000.00) a month because of the dilatory tactics of Ford. (Ex. 16) The approval should have taken a little over one month and instead took over fourteen months. This pressure put William Call in fear of his property (increased losses each month) and injury to his business. Once customers knew the dealership is in the midst of being sold, fewer customers buy for fear of not getting serviced. (Ex. 17, p. 155, lines 14–20)

(Id. at 15–16) Plaintiffs' reasoning and proof, while persuasive in style, do not, it is believed, constitute proof of the breach of the duty of good faith.

It is true that Ford imposed conditions on its approval of Graham. It is true that delay resulted from these conditions. The court also accepts as true plaintiffs' assertion that this delay had a deleterious effect on Bill Call Ford/Mid–Ohio and on its contract with Graham. These, however, are not the sole focus of our inquiry. Plaintiffs give the court a selective context for this claim. The Franchise Agreement clearly states that:

> In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this Agreement.

(Defendant's Appendix, Exhibit # 1, Preamble at iii ¶ F) The Franchise Agreement also provided that it "any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this agreement" would warrant its termination. (Defendant's Appendix, Exhibit # 1 at 15 ¶ 17(b)(1)). It is also therefore beyond argument that franchise rights were not freely transferrable under this Agreement. It is also indisputable that the contract (and the common law) give Ford the right to enter into and negotiate the terms of its own contract with third parties. Call Ford cannot, under Ohio law, complain that Ford exercised its rights under the contract and harmed it thereby. As was recently noted by one Ohio appeals court:

> Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith". Although courts often refer to the obligation of good faith that exists in every contractual relation, e.g. UCC 1–201; Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 438 (7th Cir.1987), this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolve explicitly by the parties.

Bennco Liquidating Co. v. Ameritrust Co. Nat'l Ass'n., 1993 WL 51271, *3 (Cuyahoga Cty.1993). See also Gaul v. Olympia Fitness Center, Inc., 1993 WL 204546 (Cuyahoga Cty.1993) (so holding). Here, of course, the parties did contemplate that Ford could ne-

gotiate its own contract with a successor on its own terms. Call Ford may not, therefore, complain that Ford's doing so breached the duty of good faith. Summary judgment must be granted on this claim.[9]

## C. Count Three

In count three, plaintiffs allege that the defendant tortiously interfered with its asset-purchase agreement with Graham. Plaintiffs claim that such interference took the form of correspondence to Mr. Graham informing him that his purchase price was excessive, and by virtue of the defendant's violation of § 4517.57(F) [10] which purportedly prohibited the defendant from failing to transfer a "like" franchise to the purchaser. (*See* Plaintiff's Opposition, Docket #74 at 18–21, 21–22).

As the undersigned noted in *Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 57, 379 N.E.2d 235 (Summit Cty.1977):

The basic principle of such an action is that one who, without privilege to do so, induces or otherwise purposely causes a third party not to enter into or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused. thereby.

We hold that to conclude that the defendant is liable for business interference, a finder of facts must find that:

(1) defendant's conduct interfered with the business rights of plaintiffs, and

(2) taking into consideration the situation and relationship of the parties, such conduct on the part of the defendant lacked any privilege as defined above.... The issue of business interference, including the question of privilege, should be submitted to the jury.[11]

This summary maintains vitality to this day. *See, e.g.,* 88 Ohio Jur.3d § 16 (1989); *Dougherty v. Parsec, Inc.,* 872 F.2d 766, 769 (6th Cir.1989) (following *Juhasz, supra,*); *Siegel v. D'Eramo,* 80 Ohio App.3d 72, 608 N.E.2d 842 (Cuyahoga Cty.1992); *Scanlon v. Gordon F. Stofer & Bro. Co.,* 1989 WL 69400 (Ohio App.1989).

■ Although the parties have not couched their analysis in such terms, the court believes the question presented on the first alleged act of interference is one of privilege. Defendant claims that the Franchise Agreement gave it the right, and hence the privilege, to counsel Graham concerning the purchase of Bill Call Ford. This is surely the case, for the Franchise Agreement between plaintiff and defendant provides:

If, in the opinion of the Company, the price to be paid for such assets appears, on the basis of the average operating results of other dealers, to result in an unsatisfactory return on investment so that such prospective purchaser (1) may not remain as a dealer, or (2) may be impelled to sell COMPANY PRODUCTS at high noncompetitive prices with a probable reduction in sales volume, the Company may, without liability to the Dealer, counsel with such prospective purchaser regarding such opinions.

(Franchise Agreement, Defendant's Appendix, Exhibit 1 at 27 ¶ 24). As the undersigned noted in *Juhasz,* the following factors are considered in determining the existence of privilege:

(a) the nature of the actor's conduct,

(b) the nature of the expectancy with which his conduct interferes,

(c) the relations between the parties,

9. The court would note, that even in the absence of Ford's contractual rights, plaintiffs have presented no evidence that Ford was not honest in fact or acted in a manner contrary to reasonable commercial standards. Thus, summary judgment would also be appropriate on that ground.

10. This citation is erroneous, plaintiffs' quoted language is found in § 4517.56(F) of the Ohio Revised Code.

11. The plaintiffs argue that because the *Juhasz* opinion stated that these issues "should be sub-

mitted to the jury", "[d]efendant's Motion for Summary Judgment must be denied." (Plaintiffs' Opposition, Docket #74 at 20). The court disagrees. Plaintiffs confuse the concepts of questions of fact with issues of fact. Questions of fact, such as those presented here, as opposed to questions of law, are submitted to the jury. On summary judgment, however, when there is no genuine issue as to the facts, or no evidence offered to support a finding of or dispute as to a material fact, submission to the jury is unnecessary.

(d) the interest sought to be advanced by the actor and

(e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.

*Juhasz,* 55 Ohio App.3d at 57, 379 N.E.2d 235. As this court has noted in other opinions addressed to the motions in the matter, Ford and plaintiffs' Franchise Agreement gives Ford the right to pick and choose its successor franchisee, and the unquestionable right to counsel the prospective successor on the price paid for the assets of the terminating dealer. The relation between the parties is therefore of paramount consideration. Ford had a contractual right, in order to protect its indisputable interests, to engage in the conduct complained of here—a right clearly deserving of society's protection. It therefore seems quite clear the Ford possessed a privilege to engage in the communication complained of. *See, e.g., Bennco Liquidating Co. v. Ameritrust Company Nat'l Assoc.,* 1993 WL 51271, *4 (Cuyahoga Cty. App.1993) ("As previously noted, the bank had a contractual right to take the challenged actions ... Thus, it cannot be held liable for tortious interference with the Seaway contract and summary judgment was also proper on this claim."); *McCartney v. Dunn & Conner, Inc.,* 386 Pa.Super. 563, 572, 563 A.2d 525, 530 (1989) ("Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract."); *Maynard v. Caballero,* 752 S.W.2d 719, 721 (Texas App.1988).

■ Despite the rather obvious conclusion we reach here, it is made more significant when viewed in light of the burden of proof applicable to this claim. In Ohio, when the issue of privilege is raised, the plaintiff bears the burden of proving the absence of such privilege. *See Bell v. Le–Ge, Inc.,* 20 Ohio App.3d 127, 132, 485 N.E.2d 282 (Cuyahoga Cty.App.1985) (Markus, J.,) ("The trial court had ample basis to rule against the counterclaim, since defendants failed to show that plaintiffs acted beyond their privilege by the reported communication."); *Billingsley Box Co. v. Miami Systems Corp.,* 1988 WL 6531, *2 (Hamilton Cty.App.1988) ("To prove tortious interference, the plaintiff must show

that the defendant, without privilege, intentionally caused the third party not to perform a contract with the plaintiff...."); *Scanlon v. Gordon F. Stofer & Bro. Co.,* 1989 WL 69400 (Cuyahoga Cty.App.1989) (Matia, J.,) ("We find, however, that no substantial probative evidence was adduced at trial to demonstrate an absence of justification and/or privilege on the part of the defendant-appellant Stofer to advise for the termination of plaintiff-appellee Scanlon."). In an attempt to fulfill this duty, plaintiffs state:

Ford claims that the Plaintiffs are barred from asserting that Ford interfered in a contractual relationship with Graham and the Plaintiffs are basing this on language in the Sales and Service Agreement. This language states that the Defendant may "counsel" if the price to be paid appears to be too high. (Ex. 6) However, counseling is not blatantly coming out and stating "you are paying too much." It is counseling the buyer in the situation.

Ford's alleged reason for stating that the blue sky is excessive is that this could result in an unsatisfactory return on investment (Ex. 19, p. 115, lines 1–17) However, Ford knew that Mr. Graham's personal net worth approached $23,000,000, (Ex. 20). Additionally, Mr. Graham was not a newcomer to this business. He has operated a Ford dealership and car dealerships for over 30 years. (Ex. 20) Furthermore, Mr. Graham is very well educated as he has a BA in accounting and is an attorney as well. (Ex. 20) Mr. Graham is certainly a well educated consumer especially of this type of transaction.

This conduct by Ford clearly rises to the level of breach of fiduciary duty, as well as a tortuous (sic) interference with a contract and a breach of the implied warranty of good faith and fair dealing. Ford was deliberately attempting to discourage Mr. Graham from purchasing William Call's franchise.

(Plaintiff's Opposition, Docket # 74 at 19–20) This argument and proof, when viewed in a light most favorable to plaintiff, simply does not tend to prove the absence of privilege or action beyond the scope of the privilege. Contrary to plaintiffs' argument, the court

believes that the Franchise clearly permits the disputed communication. It provides:

> If, in the opinion of the Company, the price to be paid for such assets appears, on the basis of the average operating results of other dealers, to result in an unsatisfactory return on investment so that such prospective purchaser (1) may not remain as a dealer, or (2) may be impelled to sell COMPANY PRODUCTS at high noncompetitive prices with a probable reduction in sales volume, the Company may, without liability to the Dealer, counsel with such prospective purchaser regarding such opinions.

(Franchise Agreement, Defendant's Appendix, Exhibit 1 at 27 ¶ 24) The court must agree with Ford's statement that "to suggest that Ford has the right to 'counsel', but not to speak candidly and forthrightly with a prospective purchase is absurd." (Defendant's Reply Brief, Docket # 73 at 10) Plaintiffs have presented no evidence that Ford's statements were untruthful, malicious, and did not fall within the plain language of the Franchise Agreement. As such, summary judgment, to the extent this claim is grounded on Ford's counselling, is appropriate. *See e.g.*, *Pierce Ford Sales, Inc. v. Ford Motor Co.*, 299 F.2d 425, 429 (2nd Cir.1962), *cert. denied*, 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962).

■ The second grounds for plaintiffs' tortious interference claim is the defendant's failure to transfer a like franchise to Graham. Plaintiff claims that the right to such a transfer arises from both Ohio Rev.Code § 4517.-56(F) and from paragraph 17(b)(1) of the Franchise Agreement. On both points, plaintiffs are in error. As noted in the court's opinion disposing of count eight, § 4517.56(F) is not applicable to the instant matter. Similarly, in the instant opinion, the court has determined that plaintiffs' construction of paragraph 17(b)(1) is in error. As noted above, plaintiffs must prove, as an element of their claim, that the "defendant's conduct interfered with the business rights of plaintiffs". *Juhasz*, 55 Ohio App.2d at 58, 379 N.E.2d 235. Inasmuch as the business right claimed by plaintiffs has no basis in statute or in paragraph 17(b)(1) of the Fran-

chise Agreement, Ford's conduct could not illegally interfere with that "right". The court further notes that, in the absence of such a right, Ford's conduct is unquestionably privileged. As noted by the New Mexico Court of Appeals:

> The mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations. Restatement (Second) of Torts § 766 comment b (1979). As long as the Bank merely refused to enter into business relations with plaintiffs and left Guardian to make its own decision on what to do about the Bank's refusal, plaintiffs have no cause of action. Restatement, supra, comment 1. As stated in Restatement of Torts § 762 (1939): One who causes intended or unintended harm to another merely by refusing to enter into a business relations with the other or to continue a business relation terminable at his will in not liable for that harm if the refusal is not (a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or (b) a means of accomplishing an illegal effect on competition, or (c) part of a concerted refusal by a combination of persons of which he is a member.

> This section was omitted from the Restatement, supra, Section 766, because the American Law Institute felt that the principles stated were more appropriately located in the field of trade regulation than in tort. Restatement, supra, Division 9, Introductory Note, at 2. It is still a viable statement of the law and continues to be cited by courts. E.g. *Vermont Nat'l Bank v. Dowrick*, 144 Vt. 504, 512, 481 A.2d 396, 400 n. 1 (1984), and cases cited therein.

> In our case, none of the above three conditions can be met, and the Bank was free to reject plaintiffs as mortgagors. The Supreme Court of Vermont, in *Dowrick*, referring to Restatement, supra, Section 762, said: "The rationale for this rule 'rests upon fundamental assumptions in free business enterprise. Each business enterprise must be free to select its business relations in its own interest.'" *Id*, comment a.

*Quintana v. First Interstate Bank of Albuquerque,* 105 N.M. 784, 786, 737 P.2d 896, 898 (1987), *cert. denied,* 105 N.M. 781, 737 P.2d 893 (1987). The same observation is germane to the case at bar.

## D. Counts Four and Five

The defendant has moved for summary judgment on counts four and five on the basis that those counts fail to state a claim upon which relief may be granted. The complaint provides:

### COUNT FOUR

14. The Plaintiff restates all of its foregoing allegations.

15. The acts and omissions of the Defendant wilful, wanton and malicious and are such that they to as entitle the Plaintiff to treble damages.

### COUNT FIVE

16. The Plaintiff restates all of its foregoing allegations.

17. The acts and omissions of Defendant, in tort and in breach of contract and violation of statutes is such as to entitle the Plaintiff double damages, treble damages, punitive damages and/or attorneys fees in a sum to be determined at trial.

(sic) (Amended Complaint at ¶¶ 14–17) While the court surmises that plaintiffs have not stated a claim in these counts, the sufficiency of the allegations contained therein has been effectively rendered moot.

In its opposition to the defendant's motion, plaintiffs state:

Count four, paragraph fourteen restates all of the allegations in paragraphs one through thirteen. (Ex. 21) Similarly, count five, paragraph seventeen, restates all of

the allegations in paragraph one through sixteen. Therefore count four states that all of the allegations in paragraphs one through thirteen were willful, wanton and malicious, and count five states that all of the allegations in paragraphs one through fifteen are tort, contract or statute violations. Based on this the Plaintiffs are entitled to double, treble, punitive and/or attorney fees. Therefore Defendant's Motion for Summary Judgement (sic) must be denied.

(Plaintiffs' Opposition, Docket # 74 at 22) This statement makes clear that no independent cause of action is alleged in these counts; they are simply additional allegations purportedly warranting enhanced damages under the substantive claims advanced in the prior counts. Inasmuch as the prior counts have been found meritless, plaintiffs "claims" in counts four and five are rendered equally ineffective. For the sake of simplicity, the court shall grant summary judgment on these "claims".

## E. Count Seven

In count seven, as noted above, plaintiffs contend that Ford's failure to timely approve the sale of the franchise to Graham violated Section 4517.56 of the Ohio Revised Code and other provisions of Chapter 4517 of the Code. The parties have hotly disputed general issues, such as notice and the statute of limitations, which relate to § 4517.56—matters which the court has indicated lie in defendant's favor. (*See* Order Addressing Count Eight at 23–25). Nevertheless, the court's further examination of these documents is rendered moot by its reading of § 4517.56. This court can find no language in that section which could support a claim for tardy failure to approve the sale of a franchise.[12] Indeed, the court can find

---

12. The only time-frame for an approval is found in Section 4517.56. That section provides, in pertinent part, the following:

The franchisor shall provide the franchisee and the prospective transferee with written notice by certified mail of any refusal to approve a sale or transfer of the business and assets or all the business and assets or a controlling interest in the capital stock of a new motor vehicle dealer *within thirty days of receipt of the written notice advising of the proposed transfer.*

The notice shall specify the objective criteria used to evaluate the prospective transferee and the criteria which the transferee failed to meet. Ohio Rev.Code § 4517.56(B) It is not disputed that plaintiff did not give the defendant the written notice specified in § 4517.56(A). (*See* Defendant's Motion, Docket # 44 at 19; Plaintiff's Opposition, Docket # 74 at 23–25). Regardless, within thirty days of learning of the Buy/Sell agreement between Bill Call Ford and Graham, both plaintiff and Graham received a letter

no language in chapter 4517 which could support such a claim. As such, the court believes summary judgment on this final claim is appropriate.

## IV. Conclusion

As the foregoing discussion indicates, no evidentiary presentation on the part of plaintiffs precludes summary judgment on counts one, two, three, four, five and seven. Accordingly, the defendant's motion for summary judgment on these counts, Docket # 44, is **GRANTED** in its entirety.

IT IS SO ORDERED.

which stated that "for the purpose of Section 4517.56 of the Ohio Revised Code, the Company objects to Mr. Graham's application to be the replacement dealer in Mansfield." (Plaintiff's Opposition, Docket # 74, Exhibits 22, 23).

Further, if plaintiff in fact contends that § 4517.56 somehow engrafts substantive duties which contravene its contract with Ford, that section may not be applied to effect such a contravention. (*See* Court's Order Addressing Count Eight).